EDMUND G. BROWN JR.
Attorney General of the State of California
DANE R. GILLETTE
Chief Assistant Attorney General
GERALD A. ENGLER
Senior Assistant Attorney General
GREGORY OTT
Deputy Attorney General
ARTHUR P. BEEVER, State Bar No. 242040
Deputy Attorney General
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA  94102-7004
 Telephone:  (415) 703-5865
 Fax:  (415) 703-1234
 Email:  Arthur.Beever@doj.ca.gov

Attorneys for Respondent

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **MARK M. LOWE,**<br><br>                              Petitioner,<br><br>       v.<br><br>**JIMMY WALKER,**<br><br>                              Respondent. | C 08-005 SI (pr)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ANSWER** |

EDMUND G. BROWN JR.
Attorney General of the State of California
DANE R. GILLETTE
Chief Assistant Attorney General
GERALD A. ENGLER
Senior Assistant Attorney General
PEGGY S. RUFFRA
Supervising Deputy Attorney General
ARTHUR P. BEEVER, State Bar No. 242040
Deputy Attorney General
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 703-5865
  Fax:  (415) 703-1234
  Email:  Arthur.Beever@doj.ca.gov

Attorneys for Respondent

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **MARK M. LOWE,**<br><br>　　　　　　　　　　Petitioner,<br><br>　v.<br><br>**JIMMY WALKER,**<br><br>　　　　　　　　　　Respondent. | C 08-005 SI (pr)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ANSWER** |

## STATEMENT OF THE CASE

On October 20, 2005, the Contra Costa District Attorney charged petitioner by amended indictment in Counts 1-4 and 6-28 with lewd and lascivious conduct with a child under 14 years of age (Cal. Penal Code § 288(a)), in Count 5 with continuous sexual abuse of a child under 14 years of age (Cal. Penal Code § 288.5), in Counts 29-40 with lewd and lascivious conduct with a child under 14 years of age by the use of force or fear (Cal. Penal Code § 288(b)(1)), and in Count 41 with sodomy of a child under 14 years of age with a 10 year age difference (Cal. Penal Code § 286 (c)(1)). Exh. 1, Clerk's Transcript ("CT") Volume 4, page 1271. The indictment also alleged an enhancement on each count for the commission of sexual offenses against multiple victims (Cal.

Penal Code § 667.61(e)(5)). 3 CT 700; *see also* 4 CT 1328. A jury found petitioner guilty on all counts and found the multiple-victim enhancement true. 4 CT 1325-1329; 5 CT 1330-1408; 7 RT 1491-1513.

On December 16, 2005, the trial court sentenced petitioner to an aggregate term of 585 years to life. 5 CT 1412-1413, 1435-1441; 7 RT 1533-1546.

On September 24, 2007, the California Court of Appeal affirmed the judgment of conviction. Exh. 8. On November 28, 2007, the California Supreme Court denied review. Exh. 10. Petitioner did not seek certiorari review in the United States Supreme Court.

On January 2, 2008, petitioner filed the current petition in this Court.

## STATEMENT OF FACTS

The California Court of Appeal summarized the facts of the crimes as follows. This summary is presumed correct. *Hernandez v. Small*, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002); 28 U.S.C. § 2254(e)(1).

Doe I, born in December 1981, was in the fifth grade when a school counselor introduced him to defendant, who was working as a teacher's aide. Doe I considered defendant "my teacher, mentor, father," and started hanging out with him. Doe I's real father "wasn't really . . . around." Defendant was "a cool guy," who helped in Doe I's special education class, took him to the arcade, and played football with him. They talked about football a lot, and defendant told him he had played football in the Canadian league.[1]

Doe I slept over at defendant's place 15 to 20 times. One night in April 1995, while they were watching TV in defendant's bedroom, defendant put his hand on Doe I's penis, underneath Doe I's clothing, for about half a minute. Doe I went to the bathroom, and when he returned defendant put his hand on his penis again. Defendant grabbed Doe I's penis again one night in June 1995. After this third incident, Doe I told his mother what defendant had done, she took him to the police station, and he gave a statement recounting what had transpired.

The prosecutor asked Doe I why he went back to defendant after defendant touched his penis the first time. Doe I had difficulty answering, but finally responded, "I was in fear."

Doe II, born in September 1985, was 11 years old and in the fifth grade when he met defendant playing basketball at the Richmond YMCA. Doe II was in foster care during the time of his relationship with defendant; over the years, he had more than 20 different foster parents. Defendant was a cool guy who said he had played professional football. Doe II started hanging out with defendant, who took him out to eat, to the movies, the horse track, and arcades.

---

1. It was stipulated that defendant never played professional football.

Doe II described defendant's apartment as "Fairyland"—a place that had a lot of candy on the table, teddy bears, "everything I wanted as a kid." San Pablo Police Officer David Krastof, who executed a search warrant at the apartment in May 2000, testified that candy and stuffed animals were the first thing you saw when you went inside. Krastof said that there were boxes of popcorn and ice cream cones on top of the microwave, and pictures of defendant on the walls along with photos of sports heroes, political figures, and religious leaders. The only bed and TV in the apartment were in the one bedroom. The bedroom had a stereo system, video games and movies.

Doe II testified that, the third time he slept over at defendant's apartment, defendant rubbed his penis for three or four minutes over his underwear, and then got on top of him and humped him for five or 10 minutes, rubbing their penises together. Doe II tried unsuccessfully to roll over or push defendant away. The outside of Doe II's underpants around his penis was wet after defendant stopped. Doe II said that the same things happened the other 40 or 50 times he slept at defendant's place over the course of a year.

When the prosecutor asked Doe II why he returned to defendant's place after the first incident, Doe II answered, "Because it was fun to do the activities that he had . . . . [¶] Playing football and—playing the sports. We went to the YMCA and being active." Doe II said defendant told him to keep his mouth shut, and he never told anyone what was happening.

Doe II moved to Vallejo and stopped seeing defendant. When he moved back to Contra Costa County, he wanted to see defendant again because he thought defendant could help him play high school football, but his foster father would not let him look defendant up.

Doe III, born in May 1988, started hanging out with defendant when he was nine or 10 years old. Defendant was his football coach and became like a father to him. He looked to defendant as a father figure because "[I] didn't have a father figure then . . . ." Defendant took him to the mountains, amusement parks, arcades, and movies. He was impressed when defendant told him that he had played professional football for the Bengals. Eventually they started calling each other father and son, and holding themselves out to others as father and son.

Doe III slept over at defendant's apartment at least twice a week when he was 10 or 11 years old. Nearly every time, defendant would get on top of Doe III and hump him, rubbing their genitals together and leaving wet spots on the front of Doe III's briefs. Defendant sometimes stroked Doe III's penis, or put Doe III's hand on defendant's penis.

When the prosecutor asked Doe III why he kept going back to defendant's place despite the abuse, Doe III answered, "Because I looked at him like a dad. It's like—it was like anything I didn't have, you know, he would get for me. He was like a trade for a trade, you could say. He did whatever he did, and in return I got whatever I wanted or something." Defendant warned him that he "better not tell" his aunt or grandmother, and he did not tell anyone what was going on. When the prosecutor asked why he did not tell anyone, he said, "Embarrassment. [¶] . . . [¶] My friends thinking, you know, hey I might have been gay, family looking at me different, church and things."

In cross-examination of Doe III, the defense brought out that he lived with his grandparents when he was involved with defendant, and that the grandparents were loving and supportive caregivers. The grandmother testified as a defense witness. In cross-examination she acknowledged that Doe III's father had not been around, and that defendant had been a mentor to Doe III. Doe III testified that he had mixed emotions when defendant was arrested. He admitted in cross-examination that he could have

Memorandum of Points and Authorities in Support of Answer - C 08-005 SI (pr)

3

chosen to spend nights with his grandparents or aunt, rather than with defendant.

Doe IV, born in October 1989, was nine or 10 years old when he met defendant. He testified that Doe III, whom he knew as defendant's son, was his best friend. Defendant was "[l]ike a mentor" to Doe IV, a "nice person" who took him to arcades and out to eat. Defendant's apartment had stuffed animals, pictures of defendant on the wall, and "[c]andy everywhere."

Doe IV slept over at the apartment once a week for three months during the summer of 1999. On every such occasion, defendant touched Doe IV's penis with his hand, got on top of Doe IV, and humped their penises together. One time defendant put his penis in Doe IV's butt. When defendant would pull Doe IV toward him, Doe IV would try to slide away from him, but defendant forced their contact.

Doe IV said that he did not tell anyone what defendant was doing to him because he was "scared," and felt that "it needed to be confidential." He said that, had he told his mother, she would have told his uncle, and the uncle would have come after defendant. Doe IV said he kept going back to defendant's house because he did not want to make defendant "paranoid and nervous" by letting him know he objected to this conduct, and because they had fun until "it came down to going to sleep."

In cross-examination, Doe IV conceded that no one forced him to go to defendant's place. He said there were "incidents" in his home when his mom "got in a fight or something," and defendant would come to check on him and his mom "would be like go with him or whatever, you know, get out of here . . . ." Doe IV told a school counselor about the molestations before he told his mother. He was removed from his home and placed in foster care after the sexual abuse was revealed.

Four other witnesses, John Doe VIII, John Doe IX, John Doe X, and Creig C., also testified about their involvement with defendant when they were children. Defendant befriended them playing sports—Doe VIII at age 11 or 12, Doe IX at age nine, Doe X at age 11,[2/] Creig C. at age 12 or 13—and they ended up sleeping at his home. The second time Creig C. slept over, he woke up and found defendant rubbing his penis with his hand. One of the times Doe IX slept over, defendant put his arm around him and rubbed his chest, an experience that made him uncomfortable. Doe X also woke up one night and felt uncomfortable when he found defendant's arm around him. Doe VIII, who testified for both the prosecution and defense, said that he slept over at defendant's home four times when he was 12, and that defendant never threatened or harmed him. When he slept over, defendant told him, but did not force him, to wear the underwear defendant bought for him. Defendant once hit him in the stomach, but not "in a physical way."

[¶] . . . [¶]

Dr. Anthony Urquiza testified over a defense *Kelly-Frye* objection (*People v. Kelly* (1976) 17 Cal.3d 24; *Frye v. United States* (D.C. 1923) 293 F. 1013) concerning child sexual abuse accommodation syndrome (CSAAS). Urquiza said that CSAAS is used to "dispel misperceptions or myths that people may have about what commonly occurs with a child who has been sexually abused." The syndrome has five facets: (1) secrecy; (2) helplessness; (3) entrapment and accommodation; (4) delayed and unconvincing disclosure; and (5) retraction.

The secrecy component addresses the fallacy that child victims of sexual abuse will

---

2. From this point we also refer to these victims as Doe instead of John Doe.

disclose what is happening to stop it from occurring. Ninety percent of victims are abused by someone with whom they have an ongoing relationship, and the dynamics of the relationship—threats, favors, special attention—may lead children to conceal their sexual abuse. Children may keep the abuse secret even if they have a good relationship with an attentive caregiver.

The helplessness component addresses the misperception that children can fend off or run away from their molesters. Children are unable to ensure their own sexual safety because their abusers are more sophisticated and physically stronger. Children are particularly vulnerable when those responsible for protecting them do not provide proper supervision, and they are especially helpless when the caregiver is the abuser.

Entrapment and accommodation refer to children's ability to cope with abuse by compartmentalizing their feelings so as to appear surprisingly normal. Urquiza said that external signs of abuse are typically very limited, and that, after 20 years of practice in the field, he is unable to tell from observing a child whether he or she has been abused.

Delayed and unconvincing disclosure describe how reports of abuse are generally made. Contrary to expectations, immediate reports of abuse are rare. Seventy[-]four percent of child abuse victims do not reveal their abuse in the first 12 months in which it occurs, and 35 percent or more of victims do not reveal the abuse until they are adults. The disclosure, when it occurs, may be unconvincing because victims generally do not disclose everything all at once, and may give different versions of events over time. Disclosure is best conceived as a process, rather than a single event, where progressively more is revealed as the victim overcomes feelings of embarrassment, humiliation and fear of retribution.

The final feature of the syndrome, retraction, occurs in 15 or 20 percent of cases, because of pressure from the perpetrator or the perpetrator's supporters, or because of fear of having to testify about what transpired.

Urquiza acknowledged that he had not met any of the victims in defendant's case, and that he was not testifying as to whether they had been molested. He said that CSAAS was "a means to describe what commonly occurs with child who have been sexually abused," rather than "a diagnostic tool." He said that there had been abundant research supporting each facet of the syndrome since it was identified in 1983, but that the syndrome was not reflected in every case.

Exh. 8 at 10-15.[3]

**STANDARD OF REVIEW**

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which imposes a "highly deferential" standard for evaluating state court rulings and "demands that state court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam). Under AEDPA, the federal court has no authority to grant habeas

---

3. Respondent's statement of facts on direct review, with record citations, appears at our Exhibit 6 at 2-11.

relief unless the state court's ruling was "contrary to, or involved an unreasonable application of," clearly established Supreme Court precedent. 28 U.S.C. § 2254(d)(1). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 127 S.Ct. 1933, 1939 (2007); *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (state court opinion must be "objectively unreasonable" to warrant habeas relief). The petitioner bears the burden of showing that the state court's decision was unreasonable. *Visciotti*, 537 U.S. at 25.

## ARGUMENT

## I.

### THE TRIAL COURT PROPERLY FOUND PETITIONER COMPETENT TO STAND TRIAL

Petitioner contends that "[t]he trial court's finding that petitioner was competent was not supported by substantial evidence." Petition at 6. He alleges the trial court ignored evidence of his incompetence, was biased against him, and erred by finding him competent to stand trial under California Penal Code section 1367. Petition at 6, 8.

**A. This Claim Must Be Dismissed**

Initially, petitioner's claim must be dismissed. Federal habeas corpus is available only on behalf of a person in custody in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); *Estelle v. McGuire*, 502 U.S. 62, 68 (1991). "A federal court may not issue the writ on the basis of a perceived error of state law." *Pulley v. Harris*, 465 U.S. 37, 41 (1984). Petitioner alleges that the trial court erred under state law, but makes no allegation of a violation of the Constitution or federal law.[4] Therefore, he is not entitled to habeas corpus relief and this claim must be dismissed.

**B. Background**

Petitioner was found not competent to stand trial on September 5, 2002, and May 28,

---

4. Petitioner cites to *Pate v. Robinson*, 383 U.S. 375 (1966) in a list of cases at the end of his petition. Petition at 7.

1  2004.  3 CT 770-771, 949.

2  On January 4, 2005, the Napa State Hospital Medical Director certified that petitioner was
3  mentally competent to stand trial.  3 CT 955.  On May 20, 2005, the trial court commenced a
4  competency bench trial.  3 CT 974.

5  **1.    The Defense Case**

6  Psychologist Edward Hyman testified as an expert in clinical and forensic psychology,
7  psycho-diagnostic testing, psychological assessment, and psycho-diagnosis.  Exh. 4, Supplemental
8  Reporter's Transcript ("SRT") Volume 1, page 8.  Dr. Hyman had examined and tested petitioner,
9  and he opined that petitioner was "certainly not competent to stand trial at this time."  1 SRT 41.

10  Attorney Mark Markowitz represented petitioner in April 2002.  He had difficulty
11  obtaining information from petitioner and believed petitioner was not competent.  1 SRT 80, 84, 86.

12  Neuropsychologist Myla Young testified as an expert in psychology, neuropsychology,
13  neuropsycho-diagnostic testing, and psycho-diagnostic testing.  1 SRT 193-194.  Dr. Young tested
14  petitioner in 2002, 2004, and 2005.  1 SRT 208-209.  Dr. Young opined that petitioner was unable
15  to assist his attorney in his defense.  1 SRT 252.

16  Neuropsychologist Carol Walser testified as an expert in forensic psychology, psychology,
17  psycho-diagnostic testic, and psycho-diagnostic assessment.  3 SRT 643.  Dr. Walser tested
18  petitioner and found him in the clinically significant impairment range.  3 SRT 645-646.

19  **2.    The Prosecution Case**

20  Psychologist James Jones testified as an expert in trial competency.  2 SRT 393.  Dr. Jones
21  observed petitioner for 2-3 hours per day, 4 days a week, since petitioner began his 2002 stay at
22  Napa State Hospital.  2 SRT 393-398.  Dr. Jones noted that petitioner functioned well in every
23  setting.  2 SRT 403-404.  Petitioner helped other patients with their legal matters, and he was
24  competent to stand trial.  2 SRT 405-406.  In Dr. Jones's opinion, petitioner's refusal to discuss his
25  criminal charges was due to choice, not mental illness.  2 SRT 444; *see also* 2 SRT 488-490.

26  Forensic neuropsychologist Larry Wornian testified as an expert in psychology,
27  neuropsychology, and the assessment of competency.  3 SRT 529.  Dr. Wornian met with petitioner
28  twice, and opined that he was competent on both meetings.  3 SRT 530-531.  Dr. Wornian

questioned the results of Dr. Young's testing, because a patient with the results she found would have been unable to participate in activities that petitioner participated in. 3 SRT 534-540. Dr. Wornian also contested the results of Dr. Hyman's test, particularly in certain instances where Dr. Hyman had rated petitioner's responses to questions as zero, although the responses were reasonable. 3 SRT 574-580.

Psychologist Paul Good testified as an expert in competency. 3 SRT 665. He found that Dr. Hyman's test was flawed because Dr. Hyman did not sufficiently probe petitioner for additional responses. 3 SRT 665-666.

### 3. The Trial Court's Ruling

The trial court found petitioner competent to stand trial. 4 SRT 740-746; 4 CT 1239. It rejected the results of the defense experts's tests as "an insult" and "purposely skewed and biased." 4 SRT 731. It declared, "the totality of the evidence that's been presented here and my observations of the defendant during trial simply demonstrate to me that Mr. Lowe is a client who is difficult to deal with, and not that he can't rationally assist counsel in providing a defense." 4 SRT 742-743.

**C. The Decision Of The California Court Of Appeal Was Not Objectively Unreasonable**

The California Court of Appeal rejected petitioner's argument. Exh. 8 at 9-10. It held:

> Jones's expert opinion alone constituted substantial evidence from which the court could find that defendant was competent. That opinion, based on extended observations of defendant, was reasonable, credible and of solid value. Defendant submits that his experts' opinions were entitled to greater weight than that of Jones because they had tested him more recently than Jones had observed him, but the relative weight of the competing opinions was a judgment call for the trial court. . . . [¶] The court rendered a well-reasoned decision based on a careful review of the evidence, and the evidence provided ample support for its determination.

Exh. 8 at 9-10.

The state appellate court's conclusion was not objectively unreasonable. The conviction of a legally incompetent person violates due process, and where the evidence raises a bona fide doubt about the defendant's competency, due process requires that a full competency hearing be held. *Pate v. Robinson*, 383 U.S. 375 (1966). "The test for competency, at least for federal habeas purposes, is 'whether [defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual

understanding of the proceedings against him." *Hernandez v. Ylst*, 930 F.2d 714, 716, n.2 (9th Cir. 1991); *see Godinez v. Moran*, 509 U.S. 389 (1993). California follows the same standards under Penal Code sections 1367 and 1368. *See People v. Pennington*, 66 Cal.2d 508, 517 (1967); *People v. Stankewitz*, 32 Cal.3d 80, 92 (1982). The Court of Appeal reasonably upheld the trial court's finding that petitioner was competent to stand trial. The trial court was aware of the competency issue, and considered the evidence before rendering its decision. That decision is presumed correct on federal habeas review. *Demosthenes v. Baal*, 495 U.S. 731, 735 (1990). Moreover, that decision was supported by the expert testimony of Drs. Jones and Wornian and the trial court's personal observations of petitioner. The trial court was not obligated to favor petitioner's contrary experts. *U.S. v. Chischilly*, 30 F.3d 1144, 1150 (9th Cir. 1994). Moreover, the value of their testimony was substantially reduced by the testimony of Drs. Wornian and Good. In all events, the decision of the Court of Appeal was not objectively unreasonable. Petitioner's claim must therefore be denied.

## II.

**THE TRIAL COURT PROPERLY ADMITTED EVIDENCE OF CHILD SEXUAL ABUSE ACCOMMODATION SYNDROME**

Petitioner contends that the trial court's wrongful admission of CSAAS evidence was fundamentally unfair. Petition at 6, 8. He contends that CSAAS is "junk science" and "has been rejected by the relevant scientific community as a diagnostic tool for making child sexual abuse determinations." Petition at 8.

The state appellate court rejected petitioner's argument. It ruled:

> In [*People v. McAlpin*, 53 Cal.3d 1289, 1300-1301 (1991)], our Supreme Court indicated that expert testimony on CSAAS "'[i]s needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior,[']'" and noted that the "great majority of courts approve" of the use of such testimony. (See also Askowitz et al., *The Reliability of Expert Psychological Testimony in Child Sexual Abuse Prosecutions* (1994) 15 Cardozo L.Rev. 2027, 2039, 2040 ["[t]here appears to be acceptance within the scientific community that CSAAS identifies and describes behavioral characteristics commonly found in victims of child sexual abuse. . . . [¶] . . . [¶] The overwhelming majority of jurisdictions will allow testimony based on CSAAS when it is used to explain the significance of the child complainant's seemingly self-impeaching behavior, such as delayed reporting or recantation"].)
>
> [¶] . . . [¶]
>
> Defendant contends more broadly that "it is time to reconsider the propriety of

Memorandum of Points and Authorities in Support of Answer - C 08-005 SI (pr)

9

> admitting [CSAAS] testimony at all." [¶] . . . [¶] However, defendant cites no authority for this proposition other than assertions in *Commonwealth v. Dunkle* (Pa. 1992) 602 A.2d 830, 836-838 . . . . *Dunkle*'s reasoning was implicitly rejected in *McAlpin*, which adhered to the majority rule that CSAAS is admissible, and no subsequent case suggests that our Supreme Court would now hold a different view. To the contrary, the court reaffirmed *McAlpin*'s endorsement of CSAAS testimony in *People v. Brown* (2004) 33 Cal.4th 892, 906. . . .
>
> Defendant's other argument against admission of the CSAAS evidence is that the syndrome is "junk science." Again, however, his supporting authorities are inapposite. He cites articles showing that CSAAS "has been rejected by the relevant scientific community as a diagnostic tool for making child sexual abuse determinations," but Dr. Urquiza explained that the syndrome was not a diagnostic tool, and that he was not purporting to opine on whether any of the victims had in fact been molested. CSAAS evidence was properly admitted here for the limited purpose described in CALJIC No. 10.64.

Exh. 8 at 16-18.

The state appellate court's conclusion was not objectively unreasonable. Federal habeas corpus does not ordinarily lie to review questions about the admissibility of evidence. *Estelle v. McGuire*, 502 U.S. 62, 67-72 (1991). In any event, the CSAAS testimony was properly admitted. As the Court of Appeal stated, Dr. Urquiza carefully explained that the syndrome was *not* a diagnostic tool, as petitioner alleges. 6 RT 1228; *see also* 5 RT 1028-1029. Further, the admission of such evidence does not affront the due process clause. *See Brodit v. Cambra*, 350 F.3d 985, 991 (2003); *United States v. Antone*, 981 F.2d 1059, 1062 (9th Cir. 1992). Petitioner cites no clearly established contrary law, and his claim therefore fails.

Further, any error was harmless because it had no substantial and injurious effect on the verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *see Fry v. Pliler*, 127 S.Ct. 2321 (2007). Dr. Urquiza's own testimony established that the syndrome was not to be considered a tool for determining whether a child had been sexually abused, and he rejected any suggestion that his analysis indicated that the victims had actually been molested. 5 RT 1028-1029; 6 RT 1228. Moreover, the jurors were repeatedly instructed, "This evidence is not received and must not be considered by you as proof that the alleged victim's molestation claims are true. . . . You should consider the evidence concerning the syndrome and its effect only for the limited purpose of showing, if it does, that the alleged victims' reactions as demonstrated by the evidence are not inconsistent with their having been molested." 5 RT 1027-1028; 7 RT 1455-1456. The prosecutor

reminded the jurors of that limitation in closing argument. 7 RT 1381-1383, 1426. Accordingly, the admission of the CSAAS evidence, if error, could not have contributed to the jury's verdict, which was properly based on the overwhelming evidence of petitioner's guilt.

### III.

**COUNSEL WAS NOT INEFFECTIVE FOR FAILING TO OBJECT TO THE ADMISSION OF EXPERT TESTIMONY ON CHILD SEXUAL ABUSE ACCOMMODATION SYNDROME**

Petitioner contends that his attorney was ineffective for failing "to lodge all objections to expert testimony on CSAAS . . . ." Petition at 6.

The state appellate court did not address petitioner's ineffective assistance of counsel claim, because it rejected petitioner's argument that the CSAAS evidence was improperly admitted.[5/] Exh. 8 at 16-18.

The state appellate court's decision was not objectively unreasonable. For petitioner's claim to succeed, he must demonstrate that counsel's performance was deficient and that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Initially, counsel *did* object to the admission of the CSAAS evidence. 5 RT 948, 1009. Assuming that petitioner desired counsel to have made a further objection on the grounds that admission of the evidence affronts the Due Process Clause of the Constitution, his claim nevertheless fails. As described above, the Court of Appeal reasonably held that the CSAAS evidence was properly admitted. Exh. 8 at 16-18. Therefore, an objection would not have been successful. Moreover, even if the CSAAS evidence had been excluded, the overwhelming evidence of petitioner's crimes would have produced the same result. Counsel was therefore not ineffective for failing to make an objection that would not have produced a different result in the trial. *Landry v. Lynaugh*, 844 F.2d 1117, 1120 (5th Cir. 1988); *see also United States v. Aguon*, 851 F.2d 1158, 1172 (9th Cir. 1988) (en banc), *overruled on other grounds*, *Evans v. United States*, 504 U.S. 255 (1992).

---

5. Petitioner presented his claim of ineffective assistance of counsel to the Court of Appeal as an alternative claim. Specifically, he contended that if the court found his direct challenge to the admission of the CSAAS evidence forfeited by failure to object, then the failure was ineffective assistance of counsel. Exh. 5 at 70-73; *see also* Exh. 9 at 26-28 [same].

# IV.

## PETITIONER'S SIXTH AMENDMENT CLAIM IS MERITLESS

Petitioner contends he was denied his right to a jury trial because his sentence was based on factual findings used to impose the upper term that were not decided by a jury, in violation of *Cunningham v. California*, 549 U.S. 270 (2007), *Blakely v. Washington*, 542 U.S. 296 (2004), and *Apprendi v. New Jersey*, 530 U.S. 466 (2000). Petition at 6, 8-9.

### A. Background

At the sentencing hearing, the trial court found the following aggravating circumstances: (1) the crimes disclosed a high degree of cruelty; (2) the victims were particularly vulnerable; (3) the crimes were carried out with planning, sophistication, and professionalism; and (4) petitioner took advantage of a position of trust. It found one mitigating factor: appellant had no prior criminal record. The trial court found that the aggravating circumstances outweighed the mitigating circumstance. 7 RT 1535-1537. It imposed the upper term for continuous sexual abuse of a child under 14 years of age (count 5) and sodomy of a child under 14 years of age with a 10 year age difference (count 41). 7 RT 1545.

After appellant's opening brief in the California Court of Appeal was filed, the United States Supreme Court decided *Cunningham v. California*, 549 U.S. 270. The Supreme Court held that California's procedure for selecting upper terms violates the defendant's Sixth and Fourteenth Amendment right to jury trial, because it "assigns to the trial judge, not to the jury, authority to find the facts that expose a defendant to an elevated 'upper term' sentence." *Id*. at 860. The Supreme Court noted that "under the Sixth Amendment, any fact that exposes a defendant to a greater potential sentence must be found by a jury, not a judge, and established beyond a reasonable doubt, not merely by a preponderance of the evidence." *Id*. at 863-864. Thus, "the Federal Constitution's jury-trial guarantee proscribes a sentencing scheme that allows a judge to impose a sentence above the statutory maximum based on a fact, other than a prior conviction, not found by a jury or admitted by the defendant." *Id.* at 860, *citing Apprendi v. New Jersey*, 530 U.S. 466; *Blakely v. Washington*, 542 U.S. 296; and *United States v. Booker*, 543 U.S. 220 (2005). The Supreme Court disagreed with the California Supreme Court's decision in *People v. Black*, 35 Cal.4th 1238 (2005), holding that

California's upper term procedure was constitutional under *Apprendi, Blakely,* and *Booker*. *Id.* at 871.

The California Court of Appeal rejected petitioner's claim, concluding that the trial court erred under *Cunningham*, but that the error was harmless. Exh. 8 at 18-19; *see People v. Sandoval*, 41 Cal.4th 825 (2007). Specifically, it stated:

> We have no doubt that a jury would have found true multiple aggravating factors supporting the upper term sentences for the crimes against Doe II and Doe IV here.
>
> The evidence established that defendant sought out situations where he could meet and befriend the young boys on which he preyed. Defendant set up his apartment to be what Doe II called a "Fairyland" for his victims with, as Doe IV recalled, stuffed animals and "candy everywhere." The apartment was arranged so as to lure children who slept over into defendant's bed, the only bed in the apartment, next to the only TV. We can confidently conclude that a jury would have found, beyond a reasonable doubt, that the crimes were carried out with considerable planning.
>
> Doe II, an 11-year-old boy with multiple foster placements, was "obviously and indisputably" . . . a particularly vulnerable victim. Defendant—Doe IV's "mentor" and "father" of his best friend—clearly and uncontestably took advantage of a position of trust in Doe IV's life.

Exh. 8 at 18-19.

**B.  Any Sentencing Error Was Harmless**

The state court's decision to uphold petitioner's sentence was not objectively unreasonable. "Failure to submit a sentencing factor to the jury, like failure to submit an element to the jury, is not structural error." *Washington v. Recuenco*, 548 U.S. 212, 222 (2006). Rather, it is subject to harmless error analysis on direct review under *Chapman v. California*, 386 U.S. 18 (1967) and in this proceeding under *Brecht v. Abrahamson*, 507 U.S. 619, 637. *Washington v. Recuenco*, 548 U.S. 212, 222. The California Court of Appeal followed that standard when it held that "the jury, applying the beyond-a-reasonable-doubt standard, unquestionably would have found true at least a single aggravating circumstance . . . ." Exh. 8 at 18. This conclusion was amply supported by the evidence cited by the Court of Appeal. As it was not objectively unreasonable, petitioner's claim fails.

**CONCLUSION**

Accordingly, respondent respectfully requests that the petition for writ of habeas corpus be denied.

Dated: July 11, 2008

Respectfully submitted,

EDMUND G. BROWN JR.
Attorney General of the State of California

DANE R. GILLETTE
Chief Assistant Attorney General

GERALD A. ENGLER
Senior Assistant Attorney General

GREGORY OTT
Deputy Attorney General

/s/ Arthur P. Beever
ARTHUR P. BEEVER
Deputy Attorney General

Attorneys for Respondent

20122477.wpd
SF2008401204

Memorandum of Points and Authorities in Support of Answer - C 08-005 SI (pr)

14

# TABLE OF CONTENTS

| | Page |
|---|---|
| STATEMENT OF THE CASE | 1 |
| STATEMENT OF FACTS | 2 |
| STANDARD OF REVIEW | 5 |
| ARGUMENT | 6 |
|     I.    THE TRIAL COURT PROPERLY FOUND PETITIONER COMPETENT TO STAND TRIAL | 6 |
|         A.    This Claim Must Be Dismissed | 6 |
|         B.    Background | 6 |
|             1.    The Defense Case | 7 |
|             2.    The Prosecution Case | 7 |
|             3.    The Trial Court's Ruling | 8 |
|         C.    The Decision Of The California Court Of Appeal Was Not Objectively Unreasonable | 8 |
|     II.    THE TRIAL COURT PROPERLY ADMITTED EVIDENCE OF CHILD SEXUAL ABUSE ACCOMMODATION SYNDROME | 9 |
|     III.    COUNSEL WAS NOT INEFFECTIVE FOR FAILING TO OBJECT TO THE ADMISSION OF EXPERT TESTIMONY ON CHILD SEXUAL ABUSE ACCOMMODATION SYNDROME | 11 |
|     IV.    PETITIONER'S SIXTH AMENDMENT CLAIM IS MERITLESS | 12 |
|         A.    Background | 12 |
|         B.    Any Sentencing Error Was Harmless | 13 |
| CONCLUSION | 14 |

**TABLE OF AUTHORITIES**

Page

**Cases**

*Apprendi v. New Jersey*
530 U.S. 466 (2000) .......................................................................................................... 12, 13

*Blakely v. Washington*
542 U.S. 296 (2004) .......................................................................................................... 12, 13

*Brecht v. Abrahamson*
507 U.S. 619 (1993) .......................................................................................................... 10, 13

*Brodit v. Cambra*
350 F.3d 985 (2003) ................................................................................................................ 10

*Chapman v. California*
386 U.S. 18 (1967) .................................................................................................................. 13

*Cunningham v. California*
549 U.S. 270 (2007) ................................................................................................................ 12

*Demosthenes v. Baal*
495 U.S. 731 (1990) .................................................................................................................. 9

*Estelle v. McGuire*
502 U.S. 62 (1991) ............................................................................................................... 6, 10

*Evans v. United States*
504 U.S. 255 (1992) ................................................................................................................ 11

*Fry v. Pliler*
127 S.Ct. 2321 (2007) ............................................................................................................. 10

*Godinez v. Moran*
509 U.S. 389 (1993) .................................................................................................................. 9

*Hernandez v. Small*
282 F.3d 1132 (9th Cir. 2002) ................................................................................................... 2

*Hernandez v. Ylst*
930 F.2d 714 (9th Cir. 1991) ..................................................................................................... 9

*Landry v. Lynaugh*
844 F.2d 1117 (5th Cir. 1988) ................................................................................................. 11

*Lockyer v. Andrade*
538 U.S. 63 (2003) .................................................................................................................... 6

*Pate v. Robinson*
383 U.S. 375 (1966) ............................................................................................................... 6, 8

**TABLE OF AUTHORITIES  (continued)**

**Page**

*People v. Black*
35 Cal.4th 1238 (2005) ............................................................................................... 12

*People v. Pennington*
66 Cal.2d 508 (1967) ................................................................................................... 9

*People v. Sandoval*
41 Cal.4th 825 (2007) ................................................................................................ 13

*People v. Stankewitz*
32 Cal.3d 80 (1982) .................................................................................................... 9

*Pulley v. Harris*
465 U.S. 37 (1984) ...................................................................................................... 6

*Schriro v. Landrigan*
127 S.Ct. 1933 (2007) ................................................................................................. 6

*Strickland v. Washington*
466 U.S. 668 (1984) .................................................................................................. 11

*U.S. v. Chischilly*
30 F.3d 1144 (9th Cir. 1994) ...................................................................................... 9

*United States v. Aguon*
851 F.2d 1158, 1172 (9th Cir. 1988) ........................................................................ 11

*United States v. Antone*
981 F.2d 1059 (9th Cir. 1992) .................................................................................. 10

*United States v. Booker*
543 U.S. 220 (2005) ............................................................................................ 12, 13

*Washington v. Recuenco*
548 U.S. 212 (2006) .................................................................................................. 13

*Woodford v. Visciotti*
537 U.S. 19 (2002) ................................................................................................... 5, 6

**Statutes**

California Penal Code
    § 286(c)(1) ................................................................................................ 1
    § 288(a) ...................................................................................................... 1
    § 288(b)(1) ................................................................................................. 1
    § 288.5 ........................................................................................................ 1
    § 667.61(e)(5) ............................................................................................ 2
    § 1367 ..................................................................................................... 6, 9
    § 1368 ........................................................................................................ 9

**TABLE OF AUTHORITIES**  (continued)

**Page**

United States Code, Title 28
    § 2254(a)    6
    § 2254(d)(1)    6
    § 2254(e)(1)    2

**Other Authorities**

Antiterrorism and Effective Death Penalty Act of 1996    5, 6