FILED

AUG 7 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

RECEIVED

AUG 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

In The United States District Court

For The Northern District of California

San Francisco Division

Mark M. Lowe,
          Petitioner,

     V.

Jimmy Walker, Warden;
          Respondent.

No. C08-005 SI (pr)
TRAVERSE

Petitioner provides this answer with the Traverse why a writ of Habeas Corpus should be granted. Petitioner is unlawfully in the custody of Jimmy Walker, Warden of California State Prison, Sacramento, as a result of conviction by a Contra Costa County court, Trial by Jury.

# **TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES                                                                   ii

PETITION FOR REVIEW                                                                    1

ISSUES PRESENTED                                                                       2

REASONS FOR REVIEW                                                                     2

STATEMENT OF THE CASE AND FACTS                                                        2

ARGUMENT

1.    THE TRIAL COURT'S FINDING THAT PETITIONER
      WAS COMPETENT WAS NOT SUPPORTED BY
      SUBSTANTIAL EVIDENCE.                                                            3

      A.    The proceedings below.                                                     3

      B.    Argument.                                                                  5

2.    EVIDENCE OF CHILD SEXUAL ABUSE
      ACCOMMODATION SYNDROME SHOULD NO
      LONGER BE ADMITTED IN CALIFORNIA.                                               14

      A.    The proceedings below.                                                    14

      B.    CSAAS testimony should be deemed to be
            inadmissible as improper, irrelevant expert
            opinion which usurps the jury's function to
            determine credibility.                                                    15

            1.    The history of the admissibility of
                  CSAAS in California.                                                15

            2.    The premise underlying Bledsoe and
                  its progeny is no longer valid.                                     18

3.      CSAAS does not have general acceptance
        in the relevant scientific community, is
        irrelevant, and deals with matters that are not
        beyond the common knowledge of the jurors.          20

        i.      Lack of general acceptance in the relevant
                scientific community and lack of
                relevance.                                   20

        ii.     CSAAS does not meet the requirement that
                it be beyond the common knowledge of the
                jury in order to be admissible as expert
                testimony.                                   23

4.      Conclusion.                                          26

C.   Waiver.                                                 26

D.   The error in admitting CSAAS requires reversal.        28

3.   THE <u>CUNNINGHAM</u> ERROR IN THIS CASE WAS NOT
     HARMLESS.                                               33

CONCLUSION                                                   40

CERTIFICATE OF WORD COUNT                                    40

## **TABLE OF AUTHORITIES**

### **FEDERAL AUTHORITIES**

<u>Chapman</u> v. <u>California</u> (1967)                  29, 34, 35, 36, 39
386 U.S. 18

<u>Clark</u> v. <u>Duckworth</u> (7th Cir. 1990)        28
906 F.2d 1174

Cole v. Arkansas (1948)                                          39
333 U.S. 196

Cooper v. Aaron (1958)                                           35
358 U.S. 1, 18

Cunningham v. California (2007)                                  34
549 U.S.___, 127 S.Ct. 856, 166 L.Ed.2d 856

Estelle v. McGuire (1991)                                        29
502 U.S. 62

Frye v. United States (D.C. 1923)                               14
293 F. 1013

Lankford v. Idaho (1991)                                         39
500 U.S. 110

McCormick v. United States (1991)                               39
500 U.S. 257

McKinney v. Rees (9th Cir. 1993)                                 28
993 F.2d 1378

Neder v. United States (1999)                                 35, 36
527 U.S. 1

Pate v. Robinson (1966)                                          6
383 U.S. 375

People v. Shymanovitz ((th Cir. 1998)                           33
157 F.3d 1154

Presnell v. Georgia (1978)                                       39
439 U.S. 14

Richardson v. Marsh (1987)                                       33
481 U.S. 200

Strickland v. Washington (1984)                                    27
466 U.S. 668

Stirone v. United States (1960)                                    39
361 U.S. 212

Sullivan v. Louisiana (1993)                                    38, 39
508 U.S. 275

United States v. Bighead (9th Cir. 1997)                           32
128 F.3d 1329

United States v. Miller (9th Cir. 1989)                            33
874 F.2d 1255

Washington v. Recuenco (2006)                                  34, 36
548 U.S. ___, 126 S.Ct. 2977, 165 L.Ed.2d 983

## STATE AUTHORITIES

Busey v. Commonwealth (1985 Ky.)                                   22
697 S.W.2d 139

Commonwealth v. Dunkle (1992 Pa.)              21, 22, 24, 25, 30
602 A.2d 830

Del Monte v. Wilson (1992)                                         35
1 Cal.4th 1009

Lantrip v. Commonwealth (1986 Ky.)                                 22
713 S.W.2d 816

Newkirk v. Commonwealth (1997 Ky.)                                 25
937 S.W.2d 690

People v. Bassett (1968)                                            9
69 Cal.2d 122

People v. Bledsoe (1984)                                    15, 18, 22
36 Cal.3d 236

People v. Bowker (1988)
203 Cal.App.3d 385                                                16, 17, 18

People v. Bothuel (1988)
205 Cal.App.3d 581                                                        17

People v. Bryden (1998)
63 Cal.App.4th 159                                                        33

People v. Chavez (1980)
26 Cal.3d 334                                                             27

People v. Greenberger (1997)
58 Cal.App.4th 298                                                         6

People v. Hayes (1999)
21 Cal.4th 1211                                                            6

People v. Kelly (1976)
17 Cal.3d 24                                                              14

People v. Marks (2003)
31 Cal.4th 197                                                          6, 9

People v. Marshall (1997)
15 Cal.4th 1                                                               6

People v. McAlpin (1991)
53 Cal.3d 1289                                                        16, 18

People v. Patino (1994)
26 Cal.App.4th 1737                                                       29

People v. Pennington (1967)
66 Cal.2d 508                                                             13

People v. Rells (2000)
22 Cal.4th 860                                                             6

People v. Robbie (2001)                                                      19
92 Cal.App.4th 1075

People v. Samuel (1981)                                                    7, 13
29 Cal.3d 489

People v. Sandoval (2007)                                         34, 35, 37, 38
41 Cal.4th 825

People v. Scott (1994)                                                       17
9 Cal.4th 331

People v. Turner (1984)                                                       6
37 Cal.3d 302

People v. Turner (1990)                                                      26
50 Cal.3d 668

People v. Watson (1956)                                                      30
46 Cal.2d 818

## OTHER AUTHORITIES

Evidence Code section 801                                                    23
Penal Code section 1367                                                       6
Penal Code section 1368                                                       6

Bays, J. Chadwick, D. (1993) "Medical Diagnosis of the Sexually Abused
        Child" Child Abuse and Neglect 17:91-110                            20
Berliner and Conte (1993) "Sexual Abuse Evaluations: Conceptual and
        Empirical Obstacles" Child Abuse and Neglect 17, 111-125            20
Bruck, Ceci, London and Shuman Disclosure of Child Sexual Abuse:
        What Does the Research Tell Us About the Ways that Children Tell?
        Psychology, Public Policy and Law [Vol. 11, No. 1] 194             28
Kendall-Tacket, K.A., Williams, L.M., Findkelhor, D. (1993) "Impact of Sexual
        Abuse on Children: A Review and Synthesis of Recent Empirical
        Studies" Psychological Bulletin 113, 164-180                        20
Kovera, Levy, Borgida & Penrod, Expert Testimony in Child Sexual Abuse
        Cases: Effects of Expert Evidence Type and Cross-Examination (1994)
        18 Human Law and Behavior, NO. 6, 653-674                 27, 28, 33

Sacher, <u>Evidentiary Issues Frequently Arising in Sex Cases</u> (Spring 2003)
    California Defender, 43, 48                                 27
Sevilla, <u>No Danger of a Fair Trial: The State of Abuse/Molest Cases in</u>
    <u>California</u> (2006) CACJ Updates                          27

IN THE SUPREME COURT OF THE STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, ) ) ) | Crim No._____<br>[First District Court<br>of Appeal No. A112739; |
| Plaintiff and Respondent ) ) | Contra Costa County<br>No. 05-001460-5) |
| vs. ) ) | |
| MARK McCAIN LOWE, ) ) | |
| Defendant and Appellant. ) ) | |

## **PETITION FOR REVIEW**

TO:   THE HONORABLE RONALD GEORGE, CHIEF
JUSTICE, AND THE HONORABLE ASSOCIATE
JUSTICES OF THE CALIFORNIA SUPREME
COURT:

MARK McCAIN LOWE, Appellant and Petitioner in the above-

entitled case, hereby petitions this honorable Court for a grant of review following

a decision of the Court of Appeal, First Appellate District, Division 3 filed

September 24, 2007, affirming his conviction and sentence. The Court of Appeal's

unpublished opinion is attached hereto as "Exhibit A."

## ISSUES PRESENTED

1.   **WAS THE TRIAL COURT'S FINDING THAT PETITIONER WAS COMPETENT SUPPORTED BY SUBSTANTIAL EVIDENCE?**

2.   **SHOULD CHILD SEXUAL ABUSE ACCOMMODATION SYNDROME CONTINUE TO BE ADMISSIBLE IN CALIFORNIA?**

3.   **WAS THE CUNNINGHAM ERROR IN IMPOSING CONCURRENT HIGH TERMS FOR COUNT 5 HARMLESS?**

## REASONS FOR REVIEW

Review should be granted in this case as it involves substantial, constitutional and reversible error. Further, this petition is being filed to give this Court, as the state court of last resort, the opportunity to pass on the important constitutional questions presented herein before Petitioner pursues any federal review available to him.

## STATEMENT OF THE CASE AND FACTS

Petitioner adopts the procedural and factual summary set forth in the Court of Appeal's opinion at pp. 1-7 and 10-14.

## ARGUMENT

### 1.    THE TRIAL COURT'S FINDING THAT PETITIONER WAS COMPETENT WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE.

#### A. The proceedings below.

The issue of Petitioner's competence to stand trial reared its head several times before he was ultimately tried for the crimes charged. In 2002, he was found incompetent and committed to Napa State Hospital. (3 CT 770-771.) Approximately six months later he was deemed restored to competency. (3 CT 786.) Thereafter, after a ten day jury trial, Petitioner was again on May 28, 2004 found incompetent to stand trial and recommitted to Napa State Hospital. (3 CT 949, 952.) Petitioner was sent back to court at the end of January, 2005 and following a 7 day court trial, found restored to competency on July 1, 2005. (4 CT 1239.)

In so ruling, the trial court found that had Petitioner had certain mental limitations and disorders which inclined him toward tunnel vision, depression and posed memory problems. He also suffered from paranoia which caused a distrust and suspicion of others. However, the court concluded that these conditions did not establish by a preponderance of the evidence that they "keep him from being able to understand the nature of the proceedings, or being able to

-3-

assist counsel in a rational manner. (4 SRT 741.)[1] The court noted that it had

observed Petitioner's demeanor during the court trial , "which has to be

characterized as complete withdrawal. It's as if he weren't interested in what's

going on." (4 SRT 742.) The court concluded from this that Petitioner was

simply a difficult client, not one who could not rationally assist his counsel in

providing a defense. (4 SRT 742.)

The court expressed doubt in the confidence of the testing results

obtained by defense experts, believing them to be "the exercise of judgment, that

was very much skewed and biased." (4 SRT 742.) In the court's view, contrary to

the defense experts' opinion, Petitioner's answers on the various tests showed "an

above average understanding of the nature of criminal proceedings, and an above

average understanding of the nature of the charges against him and his

understanding of potential defenses to those charges." (4 SRT 743.) The court

further observed as to these issues:

> ". . . he understands what he is being charged with. He has a
> line of defense to it, that the actions of the children are
> misinterpreted, that all he was doing was disciplining them, that
> he wasn't molesting them in any fashion or form, and that he
> wants to get on with it, and he persuaded that once the witnesses
> take the stand and he confronts them that they're going to
> recant some of the things they have said, or he'll be able to

---

[1]    All agreed that understanding the nature of the proceedings
was not the issue, rather it was Petitioner's ability to assist his
counsel in a rational manner. (1 SRT 186.)

> explain the touchings as not being sexual or being for some
> other purpose." (4 SRT 743-744.)

Expanding upon this, the trial court found a lack of evidence to support the view

that Petitioner could not provide details as to the offenses in question:

> "Mr. Markowitz admitted that he never really went into them
> in any great length because his focus was on competency, as
> opposed to the merits or demerits of the underlying case. So
> although he had some question about whether–whether Mr.
> Lowe would go into the details because of this tunnel vision he
> described, he admitted, as he put it, in all fairness that he never
> did probe that very far." (4 SRT 744.)

Based on the foregoing, the trial court found Petitioner competent to

stand trial. (4 SRT 741, 746.) Petitioner contends this finding is not supported by

substantial evidence.[2]

## B. Argument.

An incompetent defendant may not be tried or punished. (Penal

---

[2]    Petitioner notes that his trial counsel again declared a doubt as
to his competency just prior to the hearing of in limine
motions on October 19, 2005. (2 RT 253.) The trial court
considered Petitioner's offer of proof and reviewed the
transcripts of the May, 2005 court trial and the ruling of July
1, 2005 as to this issue and concluded that "there is no new
evidence of a substantial change in circumstances that Judge
Spinetta considered, and I don't find any new evidence
casting doubt on Judge Spinetta's ruling." (1 RT 290.)
Defense counsel responded, "I accept the court's ruling. I just
want the record to reflect that I believe my client is severely
incompetent and he has been found twice, and I am going
forward without a client who is capable of assisting. (1 RT
290.)

Code section 1367; Pate v. Robinson (1966) 383 U.S. 375, 378.) The conviction

of such a person violates state and federal due process. (Pate, supra, 383 U.S. at p.

377; People v. Hayes (1999) 21 Cal.4th 1211, 1281.) A person is incompetent to

stand trial if he, "as a result of a mental disorder or developmental disability, is

unable to understand the nature of the criminal proceedings or to assist counsel in

the conduct of a defense in a rational manner." (Penal Code section 1367.)

A defendant who contests that he had been restored to trial

competency is presumed competent and has the burden of proof by a

preponderance of the evidence to prove otherwise. (People v. Rells (2000) 22

Cal.4th 860, 867-868.) An appellate court must uphold the finding of competence

if it is supported by substantial evidence, meaning evidence that is "reasonable,

credible and of solid value." (People v. Marshall (1997) 15 Cal.4th 1, 31; People

v. Marks (2003) 31 Cal.4th 197, 215.) Further, the reviewing court reviews "the

correctness of the trial court's ruling at the time it was made. . .and not by

reference to evidence produced at a later date." (People v. Turner (1984) 37

Cal.3d 302, 312; People v. Greenberger (1997) 58 Cal.App.4th 298, 336.)[3]

Here, Petitioner contests the sufficiency of the evidence to support

the finding that he was restored to competence.

---

[3]     Thus, the trial court's observations stated at the sentencing
haring of Petitioner's deportment at trial may not be
considered. (7 RT 1538.)

-6-

First, that Petitioner was withdrawn during the court trial does not

amount to substantial evidence of his competence. As explained by the court in

People v. Samuel (1981) 29 Cal.3d 489, 492:

> "Although a defendant subject to uncontrollable public
> outbursts may be found unfit to stand trial [citation omitted],
> it does not follow that a defendant who is physically submissive is
> automatically competent. Evidence that a defendant can
> obediently walk into the courtroom and sit quietly during
> trial does not constitute substantial proof of competence;
> indeed, it could describe one in a catatonic state."

Second, the issue of competence was essentially a battle of the

experts. Both defense experts, Drs. Hyman and Young, repeatedly tested and

evaluated Petitioner, most recently within a month or two of their testimony at the

May, 2005 court trial. They were the only experts to have any contact with

Petitioner following his second return from Napa State Hospital at the end of

January, 2005. They both concluded based on repeated standardized testing and

interviews with Petitioner that he had a significant and severe mental disorder as

well as severe learning deficits that negated his trial competence. (1 SRT 41-42,

204.) The defense also presented the testimony of attorney Michael Markowitz,

who had represented Petitioner in earlier competency proceedings but who had

visited with him in March, 2005, following his return to court, and close in time to

the instant competency trial. Markowitz, who had agreed with the earlier finding

of incompetence, saw no change in Petitioner's condition on that score, found him

-7-

fixated on his alleged mistreatment at Napa, and unable to focus on the issues in his case other than to say the victims were liars who would ultimately tell the truth in court. (1 SRT 85-86, 88-89, 96, 100, 136-138.) Markowitz, who had practiced criminal law for over 20 years and had extensive experience dealing with issues of trial competence (1 SRT 74-78) did not see how an attorney could get Petitioner to work with him or her and participate in his defense as a client should. (1 SRT 109.)

The prosecution, on the other hand, presented two experts attesting to Petitioner's trial competence, neither of whom had as recent a contact with Petitioner as all three of the defense experts. Dr. Jones was part of Petitioner's treatment team at Napa and last saw him in January, 2005. (3 SRT 512.) Dr. Jones by his own admission spent little one on one direct time with Petitioner and saw him mostly in a group setting. (2 SRT 413.) The trial court acknowledged this: The tenor of Jones' testimony and the records of Petitioner's second commitment at Napa show that he was afforded little in the way of treatment there during that stay. Despite a jury finding after a ten day trial that Petitioner was trial incompetent, Dr. Jones was clear that the staff felt from the onset that Petitioner was essentially malingering, resisting the program, and they wondered why he had been recertified. (2 SRT 447, 447, 3 SRT 488, 500.) Dr. Smith, who evaluated Petitioner within less than two weeks of his readmission to

-8-

Napa, wrote in his report that Petitioner was purposefully uncooperative and had manipulated a jury into finding him incompetent. Dr. Smith's report did not demonstrate he had any knowledge of the facts presented at Petitioner's competency jury trial that would allow him to arrive at such a conclusion. A second report prepared similarly close in time to Petitioner's readmission, indicated that the staff felt Petitioner was malingering. (4 CT 988, 990, 991, 996.) Petitioner was not prescribed any psychotropic drugs, which he had been during his first stay at Napa, merely being given anti-anxiety medication when needed. (2 SRT 418, 3 SRT 480.)

The trial court made no specific findings as to the credibility of Dr. Jones' testimony or the significance of the Napa records, which were admitted into evidence. But given that the Napa staff immediately assumed that Petitioner was a malingerer and manipulator at the start of his second stay, despite a jury verdict to the contrary, Petitioner contends the trial court unreasonably afforded Dr. Jones' opinion in May, 2005 as to his trial competency too much weight. After all, expert testimony is only as reliable as its underpinnings. (People v. Marks, supra, 31 Cal.4th at p. 269.) As observed in People v. Bassett (1968) 69 Cal.2d 122, 141; "The chief value of an expert's testimony. . .rests upon the material from which his opinion is fashioned and the reasoning by which he progresses from his material to his conclusion."

-9-

The prosecution also presented Dr. Wornian, who last evaluated Petitioner in April, 2004. (3 SRT 531.) Despite the fact that Dr. Wornian knew and respected Dr. Young and did not find any flaws in her testing, he criticized her evaluation and analysis, noting that her results were inconsistent with Petitioner's behavior and by inference thus suspect. (3 SRT 534, 560, 573.) Dr. Wornian was also critical of how Dr. Hyman had scored Petitioner's responses on various of the tests he had administered, and his failure to probe some of Petitioner's answers with follow-up questions, particularly the undisputedly key measure of trial competence, the MacArthur test. Dr. Wornian explained how he would have scored Petitioner's answers differently, resulting in a finding of competence. (3 SRT 574-580.)

In the face of this disagreement over the validity of the defense expert administered psychological tests, each side presented additional experts as to the scoring of the MacArthur test. The defense had Petitioner's answers to the MacArthur test blind scored by Dr. Walser, a neuropsychologist and Dr. Shield a clinical and forensic psychologist, both of whom independently scored Petitioner as significantly impaired. (3 SRT 648, 4 CT 1233-1234.) Both also found that Dr. Hyman had administered the test appropriately in terms of how much follow-up questioning he did. Dr. Shield further opined that additional probing of Petitioner's answers would not have raised his score significantly in any event. (4

CT 1235-1236.) The prosecution's expert, Dr. Good, although he was of the opinion that Dr. Hyman had not adequately probed Petitioner's answers, <u>also did not think Petitioner would have scored significantly higher with more probing although he might have scored higher.</u> (3 SRT 672.) Thus, even the prosecution's own surrebuttal expert did not think Petitioner would have scored appreciably better had the MacArthur test been administered with additional probing. In the light of Dr. Good's ultimate conclusion that Petitioner would not have scored significantly higher had the test been administered in the way he and Dr. Wornian saw fit, the trial court's wholesale rejection of the defense expert's opinions was unreasonable.

Third, the trial court's conclusion that since Petitioner articulated a line of defense, i.e., that his actions had been misinterpreted, that all he had done was discipline the children and they would recant their lies once they got on the witness stand, he could by inference assist his attorney rationally similarly is not based on substantial evidence. To the contrary, the uncontradicted evidence showed not only was this the only approach Petitioner was willing to entertain, he could not grasp that there might be problems with it or that there might be another approach. (1 SRT 257-260.) As attorney Markowitz explained, to have an effective defense it was important for a client to be able to give a detailed version of the events to his lawyer and he had not seen that Petitioner could do this. (1

-11-

SRT 96.)  In his conversations with Petitioner, he could not get him to understand

that there could be a problem with his defense that the children were liars and

would recant when they testified and that he needed to consider an alternative way

to counteract their testimony.  (1 SRT 100.)    Petitioner was unable "to give you

the nuts and bolts of why he didn't do this or what he can present to assist you in

showing that he didn't do this."  (1 SRT 123.)

Finally, the trial court's conclusion that attorney Markowitz, whose

formal representation of Petitioner encompassed the trial competency issue,  had

not probed Petitioner sufficiently about the underlying case to make a judgment as

to his inability to provide details about his case is not based on substantial

evidence.  Although Markowitz testified that he did not spend a lot of time

questioning Petitioner as to witnesses and defenses in the underlying case, he was

clear he did discuss these issues with Petitioner because "I still wanted to be able

to assess from my perspective what Ms. Fullerton was telling me versus what he

was trying to do, and that was to get his trial. . .if I was going to stand up in front

of a Court, it was going to be based upon my beliefs, not just the representations of

another individual."  (1 SRT 115-116.)  Markowitz further testified that with

respect to Petitioner's theme of defense, that the children would recant their lies

once they testified, "the specifics of how to go about that, my experience with him

are either lost on him or he doesn't care.  One or the other.  But it's–there's never

-12-

been an opportunity to able to sit down with him and go through it, the kind of evaluation that I think a lawyer has to do with a client on any issue." (1 SRT 138.) Thus, it is clear that Markowitz had tried to, but was unable to have any meaningful discussion with Petitioner about his proposed line of defense. The trial court's conclusion that there was an evidentiary void as to Petitioner's inability to provide details about his case was unreasonable and refuted by the evidence.

Petitioner acknowledges the force of the substantial evidence rule on appeal and the burden he assumes when challenging the sufficiency of evidence particularly where the challenge focuses on the credibility of testimony, as it does here. Nevertheless, this rule of appellate review should not be rigidified into a mantra which circumvents common sense, thereby undermining fundamental due process concerns.

Based on the foregoing, Petitioner contends that on this record, the trial court as fact finder could not reasonably have found him competent to stand trial. This error is prejudicial per se and the judgment of conviction must be reversed. (People v. Samuel, supra, 29 Cal.3d at p. 505; People v. Pennington (1967) 66 Cal.2d 508, 521.)

-13-

2.    **EVIDENCE OF CHILD SEXUAL ABUSE ACCOMMODATION SYNDROME SHOULD NO LONGER BE ADMITTED IN CALIFORNIA.**

### A. The proceedings below.

The prosecution called Dr. Anthony Urquiza to testify as an expert in Child Sexual Abuse Accommodation Syndrome ("CSAAS.") Dr. Urquiza gave a general expose on CSAAS without relating it to any specific behavior of the alleged complainants in this case.

During the initial in limine discussions of this evidence, the trial court indicated it would be "relevant and admissible if the proper foundation is laid." (3 RT 502.) During subsequent discussions of the matter before Dr. Urquiza testified, defense counsel indicated she was raising a <u>Kelly-Frye</u> objection. (5 RT 949.)[4] The court noted that the rule was that once the evidence passed muster under <u>Kelly-Frye</u>, it was generally admissible. (5 RT 949.) In later discussions, defense counsel reasserted her <u>Kelly-Frye</u> objection, "It's clearly coming in as a type of scientific studied evidence, and I don't believe it meets <u>Kelly-Frye</u>." (5 RT 1009.) The court concluded that the evidence met the <u>Kelly-</u>

---

[4]    <u>People</u> v. <u>Kelly</u> (1976) 17 Cal.3d 24, 30-32; <u>Frye</u> v. <u>United States</u> (D.C. 1923) 293 F.1013, 1014.) Per <u>Kelly- Frye</u> principles, a new scientific technique "must be sufficiently established to have gained general scientific acceptance in the particular field in which it belongs." (<u>Kelly</u>, <u>supra</u>, 17 Cal.3d at p. 30.)

-14-

Frye test, that various appellate decisions allowed it whether or not the defendant

and complainants had a family relationship, that it was accepted in the scientific

community, and that it was relevant because the credibility of the complainants

had been challenged about their continuing to return to Petitioner's house despite

the molests and their initial denial of the molests. Thus, the evidence was relevant

to explain their conduct. (5 RT 1011.) The court cautioned that the CSAAS

evidence needed to be "carefully limited to the issues I have suggested." (5 RT

1012.)

        Dr. Urquiza subsequently gave a generalized discourse on CSAAS.

Petitioner acknowledges that Dr. Urquiza's testimony was in accordance with that

which has been generally sanctioned in applicable current California caselaw,

infra. However, for the reasons set forth below, he contends that it is time to

reconsider the propriety of admitting such testimony at all and that it was in this

case reversible error to admit it.

> **B.    CSAAS testimony should be deemed to
> be inadmissible as improper, irrelevant
> expert opinion which usurps the jury's
> function to determine credibility.**

> **1. The history of the admissibility of
> CSAAS evidence in California.**

More than twenty years ago in People v. Bledsoe (1984) 36 Cal.3d

236, this Court held the admission of a rape counselor's testimony about the

various phases of rape trauma syndrome and of her ultimate opinion that the alleged victim suffered from it to be error. (<u>Id</u>., at pp. 241-244, 251.)  However, the Court created an exception to the inadmissibility of the syndrome to prove a rape had occurred, stating that when offered to explain conduct which a juror might find inconsistent with a claim of rape, "in such a context expert testimony on rape trauma syndrome may play a particularly useful role by disabusing the jury of some widely held misconceptions about rape and rape victims, so that it may evaluate the evidence free of the constraints of popular myths." (<u>Id</u>., at pp. 247-248.)

Following <u>Bledsoe</u>, this Court has held that an expert witness may testify about CSAAS. (<u>People</u> v. <u>McAlpin</u> (1991) 53 Cal.3d 1289, 1300-1301.) As is the case with rape trauma syndrome evidence, "expert testimony on the common reactions of child molestation victims is not admissible to prove that the complaining witness has in fact been sexually abused; it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident–e.g., a delay in reporting–is inconsistent with his or her testimony claiming molestation. [Citations.]" (<u>Ibid</u>., fn. omitted.)

The limits of this exception to the inadmissibility of syndrome evidence to prove rape were defined in <u>People</u> v. <u>Bowker</u> (1988) 203 Cal.App.3d 385, a case dealing with the admissibility of evidence of CSAAS.  The <u>Bowker</u>

court determined that it was improper to allow general testimony of the syndrome

"in such a way as to allow the jury to apply the syndrome to the facts of the case

and conclude the child was sexually abused." (Id., at p. 393.) Leaving such an

application to the jurors was dangerous because of their lack of training in the

perils of "drawing predictive conclusions." (Id., at p. 393.) Thus, general,

educational testimony on CSAAS even if there is no reference to the victim is

inadmissible because it "has the potential of being used by an untrained jury as a

construct within which to pigeon-hole the facts of the case and draw the

conclusion that the child must have been molested." (People v. Bothuel (1988)

205 Cal.App.3d 581, 587, overruled on other grounds in People v. Scott (1994) 9

Cal.4th 331, 348.)

　　　　　In order to alleviate the potential for misapplication of syndrome

evidence by the jury, the Bowker court prescribed the following limitations:

> "First of all, the evidence must be tailored
> to the purpose for which is being received.
> Bledsoe does not make 'general' testimony on
> CSAAS admissible in every, or for that matter
> any, child abuse case. Although Bledsoe
> can be read to prohibit CSAAS testimony unless it
> is being used to rebut a defendant's attack
> on the credibility of the alleged victim(s), at
> a minimum the evidence must be targeted to a
> specific 'myth' or 'misconception' suggested
> by the evidence. [Citation omitted.] For instance,
> where a child delays a significant period of time
> before reporting an incident or pattern of abuse,
> an expert could testify that such delayed

-17-

> reporting is not inconsistent with the secretive
> environment often created by an abuser who occupies a position of
> trust. . . In the typical criminal case, however, it is the People's
> burden to identify the myth or misconception the evidence is
> designed to rebut." (Bowker, supra, 203 Cal.App.3d at pp. 393-394.)

The second limitation was that the jury must be instructed that the expert's

testimony is not to be used as a basis to determine that the victim's molest claim is

true. (Id., at p. 394.)[5]

## 2. The premise underlying Bledsoe and its progeny is no longer valid.

Bledsoe and its progeny, including McAlpin, are based on the

premise that jurors really believe certain myths, such as that all rape victims do not

delay in reporting a rape or that child molesters are gay, alcoholic, shabby old men

who linger in play yards, luring unsuspecting children with candy or money.

(Bledsoe, 36 Cal.3d at p. 247; McAlpin, 53 Cal.3d at pp. 1302-1303.) Given the

intense media discussion of the subject of sexual assault in the years since Bledsoe

and McAlpin as well as the other relevant cases were decided, it is questionable

whether this underlying premise of false stereotypes is still valid. If this

underlying premise is no longer valid, then the reason for allowing evidence such

as CSAAS no longer exists.

Indeed, that such premise does not have continuing validity has been

---

[5]     The jury was so instructed in this case. (SCT 93, 7 RT 1455-1456.)

-18-

suggested by one reviewing court. In <u>People</u> v. <u>Robbie</u> (2001) 92 Cal.App.4th

1075, the appellate court reversed the defendant's conviction because the

prosecutor convinced the trial court to allow him to introduce evidence about the

characteristics of people who commit rapes to disabuse the jury of common

misperceptions about the conduct of rapists. (<u>Id.</u>, at p. 1082.) In defending the

admissibility of the evidence, the Attorney General argued that "'a common

citizen, inexperienced in rape and rapists could be understood naturally to believe

that a rape is a harsh, violent, threatening and unrelenting experience.'" (<u>Id.</u>, at p.

1085-1086.) In responding to such argument, the court stated:

> "Defense counsel did not challenge the
> existence of public misconceptions about
> sex offenders, requiring the admission of
> expert testimony. Evidence Code section 801,
> subdivision (a) requires that expert testimony
> be '[r]elated to a subject that is sufficiently
> beyond common experience that the opinion of
> an expert would assist the trier of fact.'
> <u>The presupposition that the public shares the
> mistaken view articulated by the Attorney
> General is certainly debatable.</u> Because no
> objection on this ground was made, however,
> the issue was never joined at the trial level."
> (<u>Id.</u>, at 1086, emphasis added.)

-19-

> **3. CSAAS does not have general acceptance
>     in the relevant scientific community,
>     is irrelevant, and deals with matters
>     that are not beyond the common knowledge of the jurors.**
>
> > **i. Lack of general acceptance in the
> >     relevant scientific community and lack
> >     of relevance.**

CSAAS is junk science, rejected by the scientific community as well

as its very creator, Dr. Roland Summit. It has been rejected as a diagnosis by the

American Psychiatric Association's Diagnostic and Statistical Manual (DSM IV).

It has been rejected by the relevant scientific community as a diagnostic tool for

making child sexual abuse determinations. Bays J., Chadwick, D. (1993) "Medical

Diagnosis of the Sexually Abused Child" Child Abuse and Neglect 17: 91-110;

Kendall-Tackett, K.A., Williams, L.M., Finkelhor, D. (1993) "Impact of Sexual

Abuse on Children; A Review and Synthesis of Recent Empirical Studies"

Psychological Bulletin 113, 164-180; Berliner & Conte (1993) "Sexual Abuse

Evaluations: Conceptual and Empirical Obstacles" Child Abuse and Neglect 17,

111-125.) Its creator, Dr. Roland Summit, has rejected it by warning that using

"syndrome evidence" for diagnostic testimony does not meet the criteria for

scientific reliability required by Kelly-Frye. (Summit, R.C. (1992) "Abuse of the

Child Sexual Abuse Accommodation Syndrome" Journal of Child Sexual Abuse

1(4) 153-163.)

The Pennsylvania Supreme Court cogently summarized the reasons

why CSAAS has not gained general acceptance in the scientific community. In

Commonwealth v. Dunkle (1992 Pa.) 602 A.2d 830, 529 Pa. 168, the court

explained:

> "This syndrome [CSAAS] is an attempt to
> construct a diagnostic or behavioral profile
> about sexually abused children. The existence
> of such a syndrome as either a generally
> accepted diagnosis or as relevant evidence is
> not supportable. Several commentators have
> noted that the so-called 'sexual abuse syndrome'
> is not specific enough to sexually abused
> children to be accurate.
>
> The principal flaw with the notion of a
> specific syndrome is that no evidence indicates
> that it can discriminate between sexually abused
> children and those who have experienced other
> trauma. Because the task of a court is to make
> such discriminations, this flaw is fatal. In
> order for a syndrome to have discriminant
> ability, not only must it appear regularly
> in a group of children with a certain experience,
> but it also must not appear in other groups of
> children who have not had that experience.
> [footnote omitted.]
>
> According to the literature on the subject,
> there is no one classical or typical personality
> profile for abused children. [Footnote omitted.] The difficulty with
> identifying a set of behaviors exhibited by abused children is that
> abused children react in a myriad of ways that may not only be
> dissimilar from other sexually abused children,  but may be the very
> same behaviors as
> children exhibit who are not abused."

. . . . . . . . . . . . . . . . . . .

-21-

> One cannot reliably say that a child
> exhibiting a certain combination of behaviors
> has been sexually abused rather than, for
> instance, physically abused, neglected, or
> brought up by psychotic or antisocial
> parents.  Although future research may
> support identification of victims by their
> behaviors, such identification is currently
> not possible. [Footnote omitted.]

The court concluded that because behavior patterns upon which the syndrome was

based were "not necessarily unique to sexually abused children," "testimony about

the uniformity of behaviors exhibited by sexually abused children is not

'sufficiently established to have gained general acceptance in the particular field in

which it belongs. [Citation omitted.]" (Id., at pp. 833-834.)[6][7]

Because the various behaviors CSAAS attributes to sexually abused

children are not necessarily unique to that population, it is as a result not probative.

As explained in Dunkle, supra, 602 A.2d at p. 834:

> "Intertwined with the notion of 'general
> acceptance in the particular field' is the

---

[6]     Also see State v. Bolin (1996 Tenn.)  922 S.W.2d 870, 873-
874; Busey v. Commonwealth (1985 Ky.) 697 S.W.2d 139,
141; Lantrip v. Commonwealth (1986 Ky.) 713 S.W.2d 816,
817.)

[7]     This is not an issue that was squarely decided by the Bledsoe
court, but rather the court implied that rape trauma syndrome
evidence was "generally recognized or used in the scientific
community from which it arose," but was not used for the
purpose sought by the prosecutor, namely to prove that a rape
occurred.  (Bledsoe, supra, 36 Cal.3d at p. 251.)

-22-

understanding of what constitutes relevant
and therefore admissible evidence. . .
Relevant evidence 'is evidence that in some
degree advances the inquiry. . .' [Citation
omitted.]  Further, as we stated in
Commonwealth v. Kichline, 468 Pa. 265, 361 A.2d 282 (1976), '[i]t
must be determined first if
the inference sought to be raised by the
evidence bears upon a matter in issue in
the case and, second, whether the evidence
"renders the desired inferences more probable
than it would be without evidence." [Citation
omitted.]

The expert testimony about behavior patterns
exhibited by sexually abused children does
not meet this threshold determination.  While
it may 'bear upon a matter in issue,' it does
not render the desired inference more
probable than not.  It simply does not render
any inference at all.  Rather, it merely
attempts– in contravention of the rules of
evidence – to suggest that the victim was,
in fact, exhibiting symptoms of sexual abuse.
This is unacceptable."

### ii.  CSAAS does not meet the requirement that it be beyond the common knowledge of the jury in order to be admissible as expert testimony.

Evidence Code section 801(a) requires that in order for expert

testimony to be admissible, it must be "related to a subject that is sufficiently

beyond common experience that the opinion of the expert would assist the trier of

fact."  Petitioner contends that the passage of nearly twenty years since the CSAAS

theory was first articulated and the proliferation in the media of various detailed

accounts of numerous child sexual abuse cases has rendered the subjects the theory

addresses as within the common knowledge of the typical juror. Indeed, the

Dunkle court so recognized some fourteen years ago, in evaluating the need for

expert testimony on various of the tenets of CSAAS theory.

>  As to the issue of delayed reporting, the Dunkle court observed:

>  > "It is understood why sexually abused children
>  > do not always come forward immediately after
>  > the abuse. They are afraid or embarrassed;
>  > they are convinced by the abuser not to tell
>  > anyone; they attempt to tell someone who does
>  > not want to listen; or they do not even know
>  > enough to tell someone what has happened."
>  > (Id., at p. 181.)

The Dunkle court noted that the reasons recited by the CSAAS expert therein for

not disclosing immediately (threats to the child, fear of embarrassment, fear of

what will happen in the home) were all "easily understood by lay people and [did]

not require expert analysis." (Id., at pp. 181-182.) The court concluded as to the

issue of the need for expert testimony of delayed reporting:

>  > "In the final analysis, the reason for the
>  > delay must be ascertained by the jury and is
>  > based on the credibility of the child and the
>  > attendant circumstance of each case. We
>  > believe that the evidence presented through
>  > the fact witnesses, coupled with an instruction
>  > to the jury that they should consider the
>  > reasons why the child did not come forward,
>  > including the age and circumstances of the

-24-

> child in the case, are sufficient to
> provide the jury with enough guidance to
> make a determination of the importance of
> prompt complaint in each case. [Footnote
> omitted.] Not only is there no <u>need</u> for
> testimony about the reasons children may
> come forward, but permitting it would
> infringe on the jury's right to determine
> credibility. [Citation omitted.]" (<u>Id</u>., at
> p. 837, emphasis in original.)

The <u>Dunkle</u> court also found that the fact that children may omit details in

describing the abuse was equally within the jury's common knowledge and that to

allow expert testimony on it impermissibly interfered with the jury's job of

determining credibility. Finally, the court arrived at the same conclusion with

respect to the need for expert testimony to explain why a child might have

difficulty recalling specific dates of times relating to acts of abuse, finding such an

expert was simply not necessary. The court concluded that it was error for the trial

court to have admitted expert testimony on the subject of delayed reporting,

omission of details and inability to recall specifics such as dates and times and that

such testimony improperly invaded the jury's province to determine credibility.

(<u>Id</u>., at p. 184-185.)[8]

       Thus, Dr. Urquiza's testimony, which was the same kind of

testimony proscribed in <u>Dunkle</u>, was improperly admitted in this case.

---

[8]    Also see <u>Newkirk</u> v. <u>Commonwealth</u> (1997 Ky.) 937 S.W.2d
690, 693-696.)

-25-

### 4. Conclusion.

For years, California courts have sanctioned the admissibility of CSAAS evidence on the narrow basis that it dispels widely held misconceptions about how sexually abused children behave or react in the wake of such alleged abuse. These courts have done so on the premise that such myths actually exist and that admitting the evidence for such a narrow purpose with a proper limiting instruction does not invade the province of the jury to decide whether the child was abused or is credible. Petitioner respectfully urges that the time has come to reexamine this premise, as the public has been thoroughly educated at this point on the myths such evidence is designed to dispel. Other jurisdictions have now rejected CSAAS evidence. Even researchers in the field have found the theory unscientific and have rejected it.

### C. Waiver.

For the following reasons the error was not waived due to trial counsel's failure to lodge all of these various objections to the CSAAS evidence in this case, simply objecting on the Kelly-Frye basis.

First, any objection based on relevance would have been futile as the trial court squarely announced its position at the inception of discussions about the admissibility of CSAAS that the evidence was relevant, thus forestalling any defense objection on that basis. (People v. Turner (1990) 50 Cal.3d 668, 703;

-26-

People v. Chavez (1980) 26 Cal.3d 334, 350, n. 5.)

Second, trial counsel's failure to lodge all appropriate objections amounts to constitutionally ineffective assistance of counsel per Strickland v. Washington (1984) 466 U.S. 668, 689-690 .

The prevailing professional norm in child abuse cases is that the trial attorney must carefully scrutinize CSAAS testimony for relevancy and object when it is irrelevant. Scientists, attorneys, and jurists alike note that "it is important for the legal system to exercise caution when considering the admission of expert psychological testimony in child sexual abuse cases." (Kovera, Levy, Borgida & Penrod, Expert Testimony in Child Sexual Abuse Cases: Effects of Expert Evidence Type and Cross-Examination, (1994) 18 Law and Human Behavior, No. 6, 653-674, 671; see also Dallas Sacher, Evidentiary Issues Frequently Arising in Sex Cases (Spring 2003) California Defender 43, 48 ["expert testimony must be closely scrutinized"].) Chuck Sevilla has advised trial counsel "to object if this expert [on CSAAS] is proffered and demand that the prosecution prove the existence of this alleged juror mythology." (Sevilla, No Danger of a Fair Trial: The State of Abuse/Molest Cases In California (2006) CACJ Updates.) Sample motions to exclude CSAAS testimony in the absence of the prosecution identifying a specific myth to which the testimony relates in the case are available on line. http://www.accused.com/resources/motions.html. Journal articles challenging the

empirical basis for CSAAS testimony are numerous and available through standard research techniques. (See generally, Bruck, Ceci, London and Shuman, <u>Disclosure of Child Sexual Abuse: What Does the Research Tell Us About the Ways That Children Tell?</u> Psychology, Public Policy and Law [Vol. 11, No. 1] 194, 197.)

It is important for trial attorneys to object to irrelevant CSAAS testimony because it is known that syndrome evidence of this sort substantially increases the rate of conviction despite the strength or weakness of the cross-examination of the expert. (<u>Expert Testimony in Child Sexual Abuse Cases</u>, <u>supra</u>. If cross-examination is ineffective as the aforementioned study finds, it becomes incumbent upon counsel to attempt to keep the evidence from the jury.

Defense counsel's failure to lodge all objections to expert testimony on CSAAS was ineffective assistance of counsel.

### D. The error in admitting CSAAS evidence requires reversal.

Petitioner contends that the wrongful admission of the CSAAS evidence was so fundamentally unfair as to deprive him of his federal constitutional rights to due process and a fair trial. (<u>McKinney</u> v. <u>Rees</u> (9th Cir. 1993) 993 F.2d 1378 [reversal of murder conviction because other crimes evidence of the defendant's knife collection and fascination with knives violated federal due process where that evidence was irrelevant to the crime charged]; see also <u>Clark</u> v. <u>Duckworth</u> (7th Cir. 1990) 906 F.2d 1174 [the defendant has a federal

-28-

constitutional right to a trial free of irrelevant and prejudicial evidence.])  Thus,
whether or not reversal is required must be assessed under the federal harmless
beyond a reasonable doubt test of Chapman v. California (1967) 386 U.S. 18, 24.

Petitioner acknowledges that Fifth District in People v. Patino (1994)
26 Cal.App.4th 1737 found in that case that the admission of CSAAS evidence did
not violate the defendant's fundamental right to a fair trial, or due process.  (26
Cal.App.4th, at p. 1747.)  However, Patino is ill-reasoned and should not be
accepted by this Court.

In reaching its conclusion, the Patino court relied specifically on
Estelle v. McGuire (1991) 502 U.S. 62, 69-70 in which the U.S. Supreme Court
found that the admission of relevant battered child syndrome evidence did not
violate due process.  The Patino court found battered child syndrome evidence
analogous to CSAAS.  (Patino, supra, 26 Cal.App.4th at p. 1747.)  However,
battered child syndrome evidence is not the same as CSAAS in terms of probity, as
recognized in Dunkle, supra, thus Patino's conclusion that is analogous fails:

> "Perhaps the lack of probative value
> of this evidence [CSAAS] is best understood
> in comparison to the so called 'battered
> child syndrome,' a diagnostic tool used by
> physicians to determine whether a child is
> the likely subject of intentional abuse or
> accidental injury.  In the battered child
> syndrome, physicians look for the following
> characteristics:
> The diagnosis of battered child syndrome is

used in connection with young children and is based upon a finding of multiple injuries in various stages of healing, primarily multiple fractures, soft tissue swelling or skin bruising. Also pertinent to the diagnosis is evidence that the child is generally undernourished, with poor hygiene, and that the severity and type of injury is inconsistent with the story concerning the occurrence of the injuries offered by parents or those who were caring for the child. [Citation omitted.] In Rodgers, the physician discussed the physical findings of the child at issue and stated a belief as to whether that child's injuries appeared to have been intentionally inflicted. [Footnote omitted.] [Citation omitted.] That type of testimony – explicit, probative and relevant – stands in stark contraposition to the type of testimony admitted in the case before us. The 'battered child syndrome' evidence is unique to physically abused children and is not overly general. Thus, it can be argued that such testimony can make it 'more likely than not' that the injuries were intentionally inflicted." (Dunkle, supra, 602 A.2d at p. 836.)

Thus, this court should reject Patino's conclusion that the admission of CSAAS evidence does not violate due process.

Were this court to employ the test of People v. Watson (1956) 46 Cal.2d 818, 836 (i.e., it is reasonably probable that the jury would have reached a more favorable result in the absence of the error), reversal would in any event be required. Under Watson, reversal is required when there is a reasonable probability that the error was prejudicial. (Watson, supra, 46 Cal.2d at p. 836.)

-30-

Pursuant to either standard this court employs the error compels
reversal. The case was a close one and boiled down to a credibility contest
between the various complainants and Petitioner. This was not a case where the
charges were established by any physical findings. There were issues with the
testimony of each complainant, selected samples follow. For example, Doe I
inexplicably never mentioned Petitioner hitting him with a belt until trial. (3 RT
594, 635.) This was in direct contrast to his Grand Jury testimony wherein he
stated Petitioner had never been physical with him. (3 RT 640.) His testimony
was inconsistent as to whether he slept over the first that Petitioner touched him.
(3 RT 585, 618, 623.) Doe I's testimony of what he wore during the alleged
molests varied from his initial statement. (3 RT 620.) His testimony varied from
what he had told a defense investigator. (7RT 1334-1335.) He also was
inconsistent as to how many molests there were, stating two to the defense
investigator, then testifying to three. (7 RT 1334-1335, 3 RT 578-603.) Doe I had
falsely accused his foster mother's husband of abuse. (6 RT 1269-1271.) Doe IV
was also inconsistent in his report of the details of the alleged molests, including
how the alleged sodomy took place, i.e. with his underwear on or off. (1 SRT 21,
49.). He originally told a social worker that he was molested five times, but this
was later expanded to include numerous counts. (6 RT 1256.) Under such
circumstances, allowing in CSAAS evidence which "had no bearing on the case,

-31-

yet functioned to insulate [Leslie] from, the normal challenges to credibility"[9]

could only have tipped the scales against Petitioner in favor of conviction. (People

v. Housley, supra, 6 Cal.App.4th at p. 958 [where the case is a credibility contest

between defendant and victim, syndrome testimony by an expert can "easily be

misconstrued by the jury as corroboration for the victim's claims" and "unfairly tip

the balance in favor of the prosecution"].)  Here, that is what the prosecutor did,

arguing that Dr. Urquiza educated the jury as to why a child might have a

seemingly inappropriate affect when recounting the details of a molest, meaning

Doe IV and his demeanor during his videotaped interview. (7 RT 1368.)  She

emphasized that the defense had not presented any expert to refute Dr. Urquiza,

the inference being his testimony was as good as gospel, and reiterated that he was

an educational source as to the various myths associated with how victims of child

abuse are supposed to behave, reiterating the myths that children tell about molest,

their helplessness and the delayed, conflicting and unconvincing disclosure,

relating these concepts to specific complainants in the case. (7 RT 1381-1383.)

Further, in a controlled study which exposed jurors to syndromal

evidence through the use of expert testimony in a child molest case, it was found

that participants who heard the expert testimony were more likely to convict the

---

[9]     United States v. Bighead (9th Cir. 1997) 128 F.3d 1329, 136
        (dissenting opn. of J. Noonan.)

-32-

defendant than those who had not. The increase in the rate of conviction for those who heard the testimony was 20%. (Expert Testimony in Child Abuse Cases, supra, at p. 663 & fn. 4.) This increased rate of conviction held despite the strength or weakness of the cross-examination of the expert. (Id., at p. 669.)

The fact that the jury heard the prescribed limiting instruction on this subject could not dispel the prejudice flowing from the admission of CSAAS evidence. Although it is generally presumed that the jury follows instructions (People v. Bryden (1998) 63 Cal.App.4th 159, 184), this presumption is "rooted less in the absolute certitude that the presumption is true than in the belief that it represents a reasonable practical accommodation. . ." (Richardson v. Marsh (1987) 481 U.S. 200, 208.) Protective instructions have frequently been found to be insufficient to cure potential prejudice. (People v. Shymanovitz (9th Cir. 1998) 157 F.3d 1154, 1161 [limiting instruction could not cure harm that defendant was a homosexual and therefore a likely child molester]; United States v. Miller (9th Cir. 1989) 874 F.2d 1255, 1263 [limiting instruction insufficient to cure harm occasioned by admission of polygraph evidence].)

Reversal is therefore required.

### 3.    THE CUNNINGHAM ERROR IN THIS CASE WAS NOT HARMLESS.

Petitioner was sentenced under California's determinate sentencing law (DSL) as to Counts 5 and 41. Those counts involved convictions of resident

-33-

child molester and sodomy, respectively.    The trial court elected to impose the upper term of 16 and 8 years, respectively as to these counts.  (7 RT 1545.)  The court cited the following factors in aggravation: the crimes showed a high degree of viciousness, cruelty and callousness [Rule 4.421(a)(1)];  the fact that the instant crime involved sophisticated planning and professionalism [Rule 4.421(a)(8)]; the victims were vulnerable [Rule 4.421(a)(3)]; and Petitioner abused a position of trust or confidence [Rule 4.421(a)(11)].  (7 RT 1535-1537.)

The reviewing court agreed there was error under Cunningham v. California (2007) 549 U.S. ___ [ 127 S.Ct. 856, 166 L.E.2d 856] but found it harmless under this Court's recent decision in People v. Sandoval (2007) 41 Cal.4th 825.

The error cannot be deemed harmless under the federal constitutional standard of Chapman v. California, supra, as applied in Washington v. Recuenco (2006) 548 U.S. ___ [126 S.Ct. 2977, 165 L.Ed.2d 983], which unquestionably applies to this case of federal constitutional error.

This Court's opinion in People v. Sandoval (2007) 41 Cal.4th 825 correctly stated the test for federal constitutional error in Cunningham cases, as set forth in Chapman and Recuenco – and then proceeded to disregard it, apparently on a one-sentence rationale contrary to the holding of Recuenco that it had just summarized.

-34-

Petitioner respectfully asks this Court to adhere to the plain language of Chapman and Recuenco. The Supremacy Clause requires that Chapman and Recuenco prevail over a state court's contrary opinion. (U.S. Const., Art. VI, cl. 2; Del Monte v. Wilson (1992) 1 Cal.4th 1009, 1023; Cooper v. Aaron (1958) 358 U.S. 1, 18.)

Sandoval was at least correct in its general statement of federal constitutional harmless-error law – under Chapman, federal constitutional error "is reviewed to determine whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" (Chapman, supra, 386 U.S. at p. 24; Neder v. United States (1999) 527 U.S. 1, 15.) In Neder, the court concluded that the trial court's failure to submit to the jury an element of the charged offense was harmless, because the evidence supporting that element was "uncontested." (Neder, at p. 17.)

As a further application of Chapman: "In Washington v. Recuenco (2006) ___ U.S. ___ [165 L. Ed. 2d 466, 126 S. Ct. 2546], the high court held that a similar harmless error analysis [to Neder] applies to the failure to submit a sentencing factor to a jury, finding no distinction, for purposes of harmless error analysis of *Sixth Amendment* violations, between a sentencing factor that must be submitted to a jury and an element of a crime." (Sandoval, supra, 41 Cal.4th at p. 838 [italics in original].) In Neder and Recuenco, the missing element was

-35-

charged in some form in the accusatory pleading (in <u>Neder</u>, implicitly as an element of the charged offense; in <u>Recuenco</u>, expressly within the weapon charge), there was no evidentiary dispute on that element, and only one rational conclusion could be drawn from the evidence.

<u>Neder</u> is merely a case-specific application of <u>Chapman</u>. (<u>Neder</u>, 527 U.S. at pp. 4, 15, 17-18.) In turn, <u>Recuenco</u> is merely a case-specific application of <u>Neder</u>. (<u>Recuenco</u>, 548 U.S. at p. ___ [126 S.Ct. at pp. 2552-2553].) Accordingly, <u>Recuenco</u> and <u>Neder</u> follow and apply, and do not purport to change it. (See also <u>Recuenco</u>, 548 U.S. at p. ___ [126 S.Ct. at p. 2550].)

Under the plain language of <u>Chapman</u>, "the beneficiary of a constitutional error [must] prove beyond a reasonable doubt that <u>the error complained of did not contribute to the verdict obtained</u>." (*Id.* at p. 24 [underscore added].)

However, this Court's <u>Sandoval</u> opinion decided not to use the plain language of <u>Chapman</u>, stating instead: "In the context of the present case, <u>the question is **not** whether the error 'contribute[d] to the verdict obtained . . . .'</u> (<u>Chapman</u>, supra, 386 U.S. at p. 24.)" (<u>Sandoval</u>, 41 Cal.4th at p. 838 [emphasis added, for comparison with underscored <u>Chapman</u> passage in the paragraph above].)

<u>Sandoval's</u> rationale for not using the <u>Chapman</u> standard is that "the

jury's verdict on the charged offense is not at issue." (<u>Sandoval</u>, 41 Cal.4th at p.

838.) This rationale, however, doesn't permit refashioning <u>Chapman</u>, as <u>Sandoval</u>

does. (The test <u>Sandoval</u> used instead of the <u>Chapman</u> test is discussed further

below.)

This rationale is also contrary to <u>Recuenco</u> as well as to <u>Chapman</u>.

<u>Sandoval</u> correctly stated that <u>Recuenco</u> "[found] no distinction, for purposes of

harmless error analysis of Sixth Amendment violations, between a sentencing

factor that must be submitted to a jury and an element of a crime." (<u>Sandoval</u>, 41

Cal.4th at p. 838.) So under <u>Recuenco</u> and <u>Chapman</u>, a verdict – or here, lack of

one – on a sentencing factor, must be treated as equivalent to a verdict on a

substantive offense.

Therefore, as <u>Recuenco</u> holds, <u>Chapman's</u> use of the word "verdict"

does not vitiate its applicability in sentencing cases. <u>Sandoval's</u> apparent contrary

conclusion must be rejected. No U.S. Supreme Court authority permits a

prejudice test for constitutional error – in any part of the trial proceedings – less

stringent than <u>Chapman</u>.

Applying <u>Chapman</u>, the error here cannot be found harmless beyond

a reasonable doubt. The error is the trial court's imposition of an upper-term

sentence based on aggravating factors that violated <u>Cunningham</u> because they

were not pled, submitted to the jury, or proved to the jury beyond a reasonable

-37-

doubt. Here, the trial court relied on aggravating factors that are vague and subjective, rather conventional elements or an enhancement. (Sandoval, supra, 41 Cal.4th at p. 840.) Because those factors are subjective, there is room for doubt as to whether the jury would necessarily have found them true. The record does not show with certainty that the trial court would have imposed the upper term if it had relied only on the aggravating factors that complied with Cunningham. Therefore, the State cannot show beyond a reasonable doubt that the trial court's actual sentencing decision was necessarily untainted by the Cunningham violation. (See also Sullivan v. Louisiana (1993) 508 U.S. 275, 279-280.) The error is reversible.

Instead of using Chapman's formulation of the harmless error test for federal constitutional error, Sandoval offers its own test: "[I]f a reviewing court concludes, beyond a reasonable doubt, that the jury, applying the beyond-a-reasonable-doubt standard, unquestionably would have found true at least a single aggravating circumstance had it been submitted to the jury, the Sixth Amendment error properly may be found harmless." (Sandoval, 41 Cal.4th at p. 839 [emphasis in original].) But as discussed above, the constitutional error that must be evaluated under Chapman is the trial court's decision-making process in imposing an upper-term sentence based in part on Cunningham errors. The Sandoval standard doesn't address that.

In addition, Chapman does not allow for Sandoval's theorizing on

-38-

what a hypothetical jury might have done with charges never made that were not submitted to the actual jury. (<u>Sullivan</u> v. <u>Louisiana</u>, <u>supra</u>, 508 U.S. at pp. 279-280.) Rather, the State must prove beyond a reasonable doubt that <u>Cunningham</u> error had no effect on the trial court's actual sentencing process. (<u>Sullivan</u>, at pp. 279-280; <u>Chapman</u>, 386 U.S. at p. 24.)

   In any event, the violations of <u>Cunningham</u> cannot themselves be deemed harmless, as they amounted to a complete deprivation of not only a jury trial and proof beyond a reasonable doubt, but also of notice in the accusatory pleading. Such errors are necessarily harmful, because"[d]eprivation of such a basic right [to be adjudged only on charges in the accusatory pleading] is far too serious to be . . . dismissed as harmless." (<u>Stirone</u> v. <u>United States</u> (1960) 361 U.S. 212, 217; see also <u>Cole</u> v. <u>Arkansas</u> (1948) 333 U.S. 196, 201; <u>McCormick</u> v. <u>United States</u> (1991) 500 U.S. 257, 269-270; <u>Presnell</u> v. <u>Georgia</u> (1978) 439 U.S. 14, 16.) Without basic notice in the accusatory pleading, the adversarial system does not function. (<u>Lankford</u> v. <u>Idaho</u> (1991) 500 U.S. 110, 126-127.) As noted above, this situation did not exist in <u>Recuenco</u>, since the sentencing factor there – arming with a firearm (a handgun) – was charged in the accusatory pleading. Not so for the <u>Cunningham</u>-violative factors here.

   Thus, the <u>Cunningham</u> error cannot be harmless.

## DECLARATION OF SERVICE BY MAIL

CASE NAME: _Mark McCain Lowe_ CASE NO: _C08-005 SI(pr)_

I, _Mark Lowe_, am a resident of the state of California Mule Creek State Prison ( M. C. S. P ) at Ione, County of Amador, California, and am at least 18 years of age, and am party to the within action. My mailing address is P.O. Box 409000, Ione, California 95640-9000.

On _Aug 5, 2008_ I served a true and correct copy of the following document(s);

_TRAVERSE_

On each party listed below by placing it in a sealed envelope, with adequate postage or provided, and depositing said envelope in the institutional mail box or turned said envelope to custodial personnel for the United States Mail at Mule Creek State Prison, P.O. Box 409000, Ione, California 956490900. Each party to the action has been duly served.

This copy is being mailed to:
_Clerk, of The United States District Court_
_Northern District of California_
_450 Golden Gate Avenue_
_San Francisco, California 94102._

I have mailed additional copies to:
_Department of Justice_
_Office of The Attorney General_
_455 Golden Gate Avenue, Suite 11000_
_San Francisco, California 94102-3664_

There is regular service by the United States Mail between the above place of mailing and the parties listed.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed this date: _Aug 5, 2008_ at Ione, California.

Signed: _mark lowe_ ,CDC No: _F18836_

## M. C. S. P MAILROOM ACKNOWLEDGEMENT OF MAILING

DATE:_____ SIGNED:_____

**EXHIBIT A**


Filed 9/24/07

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIRST APPELLATE DISTRICT

### DIVISION ONE

|  |  |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MARK McCAIN LOWE,<br><br>Defendant and Appellant. | A112739<br><br>(Contra Costa County<br>Super. Ct. No. 05-001460-5) |

Defendant Mark McCain Lowe was convicted by a jury of 41 sex offenses against four victims: 27 violations of Penal Code section 288, subdivision (a) (lewd act on a child under 14),[1] three involving John Doe I, one involving John Doe II, 11 involving John Doe III, and 12 involving John Doe IV; 12 violations of section 288, subdivision (b)(1) (forcible lewd act on a child under 14) involving Doe IV[2]; one violation of section 288.5 (continuous sexual abuse of a child under 14) involving Doe II; and one violation of section 286, subdivision (c)(1) (sodomy of a child under 14) involving Doe IV. The jury further found that the section 288 offenses were committed against more than one victim. (§ 667.61, subd. (e)(5).) Defendant was sentenced to 585 years to life in prison, representing consecutive terms of 15 years to life on the section 288 offenses. He

---

[1] All further statutory references are to the Penal Code.

[2] From this point we refer to these victims as Doe instead of John Doe.

1

received concurrent upper term sentences of 16 and 8 years for the section 288.5 (count 5) and 286 violations (count 41), respectively.

Defendant contends that: (1) the court's finding that he was competent to stand trial was not supported by substantial evidence; (2) testimony concerning child sexual abuse accommodation syndrome was erroneously admitted; and (3) his rights as set forth in *Apprendi* (*Apprendi v. New Jersey* (2000) 530 U.S. 466); *Blakely* (*Blakely v. Washington* (2004) 542 U.S. 296) and *Cunningham* (*Cunningham v. California* (2007) 549 U.S. ___ [127 S.Ct. 856, 166 L.Ed.2d 856]) were violated by imposition of the upper term sentences on counts 5 and 41. We conclude that substantial evidence supported the competency finding, the child sexual abuse accommodation syndrome evidence was properly admitted, and the sentencing errors were harmless. The judgment is therefore affirmed.

## I. COMPETENCY TRIAL

A. Background

The original indictment in the case was filed in October 2000. In January 2002, criminal proceedings were suspended pursuant to section 1368. In September 2002, defendant was found incompetent to stand trial, and he was committed in October 2002 to Napa State Hospital (Napa). Defendant was released from Napa in January 2003, and after a court trial, was found competent in March 2003. Criminal proceedings were again suspended in June 2003. In May 2004, after a jury trial, defendant was found to be incompetent. He was ordered committed to Napa in June 2004, and was certified by Napa as competent in January 2005. Defendant was found competent in July 2005, the finding challenged in this appeal, following a court trial.

Under section 1367, subdivision (a), a defendant is deemed incompetent to be tried "if, as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." The defense did not dispute that defendant understood the nature of the criminal proceedings, but maintained that he could not rationally assist his counsel.

2

B. Evidence

The defense case for incompetence rested primarily on the testimony of psychologists Edward Hyman and Myla Young, who conducted psychological evaluations of defendant, and attorney Mike Markowitz, who represented defendant in the 2002 and 2003 competency proceedings.

Hyman examined defendant from December 2001 to February 2002, in March and April 2004, and in April 2005. He tested defendant for: mental disorders (MMPI-2 and PAI-2 tests); perceptions (Rorschach); intelligence (WAIS-3); memory (WMS-3); competency to stand trial (MacArthur, ECST-R); and malingering (TOMM, SIRS). In addition to the testing, he interviewed defendant at length about his criminal case and reviewed the records of defendant's two Napa commitments.

Hyman found that defendant had a borderline IQ, and significant memory impairment. He determined that defendant suffered from chronic, severe depressive disorder, paranoid schizophrenic disorder, and NOS cognitive disorder. The NOS cognitive disorder impaired defendant's ability to make judgments, consider alternatives, and anticipate consequences. The paranoid schizophrenic disorder caused him to misperceive reality, and prevented him from trusting doctors, lawyers, or judges. Hyman opined that defendant could not assist, and would instead interfere, with his defense, because "[h]e becomes fixated on things that are unrelated to either any of the underlying charges or his trial."

Young examined and tested defendant in July 2002, April 2004, and March and April of 2005. She determined that defendant suffered from two major disorders: "brain dysfunction," and an "underlying psychotic process," which could be paranoid schizophrenia or paranoid delusional disorder. The brain dysfunction reflected problems with the frontal lobe (executive functioning, i.e., problem solving, impulse control) and the temporal lobe (memory, organization). The psychotic process resulted in "gross distortion of reality and illogical, at times, psychotic and delusional thinking."

Young opined that defendant could not reasonably or rationally assist counsel with his defense. In Young's view, defendant could not think flexibly or weigh alternatives.

3

His thinking was tangential, preservative, and illogical. His attitude toward his defense, repeatedly stated, was simply: "Don't do any investigation. Don't consider any alternative. Don't look at anything else. Just put the kids on the stand and ask them questions."

Markowitz said that when he represented defendant in 2002 and 2003, and when he spoke with him in April 2005, defendant had a single "mantra" about his case: "Get the kids in court and they will tell the truth." Markowitz said that defendant would not cooperate with him when he tried to go over police reports, and that he found it difficult to get "anything specific" from defendant about the case. "[I] would talk to him," Markowitz said, "about the alleged victims, that he would have to be able to say: Yeah, I know this kid, or I don't know this kid. Or this kid was at my house, or this kid wasn't at my house. You couldn't have that kind of conversation with him. All he would be focusing on is they are liars, the little—and the way he referred to them generally was the little bastards. And if he could get them into a courtroom: They will see me and they will tell the truth." When defendant was asked, "What happens if they don't tell the truth as you know it . . . ? [¶] He doesn't want to talk about it." Markowitz thought that defendant's biggest problem was his single-mindedness, or "tunnel vision." Previously, defendant had been focused entirely on what Markowitz called "the little bastards issue"; when Markowitz last saw him, he was obsessed about the poor treatment he felt he had received during his second stay in Napa.

Markowitz acknowledged in cross-examination that when the issue of defendant's competency was tried in 2003, at a time when defendant objected to being found incompetent and was upset by continuances of his trial, he was "absolutely able to . . . go on at great length about his frustration with [defense counsel] and that particular issue," and was able to recall specific matters such as the dates that had been set for trial. Similarly, when Markowitz was asked whether defendant, following his second stay in Napa, remembered the names of doctors he disliked and the circumstances of the episodes that upset him, Markowitz answered, "Yeah, he sure did." Markowitz said that his knowledge of defendant's unwillingness to address the specifics of the charges

4

against him was based primarily on conversations with defense counsel; he admitted that he "didn't spend a lot of time with that, because it wasn't my function . . . ."

Prosecution witness James Jones, a psychologist at Napa, saw defendant for two to three hours in the mornings, and received staff reports on defendant twice a day, during defendant's second commitment. Jones was part of the Napa team that certified that defendant was competent, and he repeated that opinion at trial.

Jones testified that defendant's level of functioning was in the top 15 percent of the clients in Napa, his behavior was "most often appropriate," he was "very fluent" in expressing himself, and he exhibited no severe brain disorder or mental illness. Defendant was "interacting well and did not show severe cognitive problems that would prevent his learning of information or retrieval of information." When asked whether he thought defendant was paranoid, Jones answered, "[i]f he was paranoid, he didn't have the severe paranoia that we are used to working with in regards to affecting his behavior throughout the day, throughout his interactions with people. I didn't see that."

Jones described defendant as "edgy" and "angry," but said that those traits did not interfere with his ability to function. He said that defendant was "very rigid" and "inflexible" at times, '[b]ut nothing that was so severe that it prohibited him from learning or responding." Defendant "was not showing us severe mental illness. He was showing us temperament." Defendant's problems were "volitional"; he was "determined to have it his own way, as opposed to being flooded with problems, with delusions and hallucinations."

While defendant refused to talk about his own case, he was able to help others in groups and make perceptive comments about their cases. Although there were notes in defendant's Napa file attesting to his lack of progress, Jones testified that his problem was clearly confined to his own case, and the Napa staff felt that "he was making a choice not to" address his case, not that he lacked the capacity to do so. It appeared very early during defendant's latest commitment that he was "just resisting," but, out of an abundance of caution, the staff continued to observe his behavior for a number of months to confirm that impression.

5

Another prosecution witness, neuropsychologist Larry Wornian, had examined defendant in July 2003 and April 2004, and had found him competent on both occasions. Wornian questioned Young's test results because those results would predict "much more gross behavioral deficits" than defendant exhibited. Wornian believed that if a person's frontal lobe function were "really grossly impaired, then that person is likely going to wind up needing placement in an institution." The tests Young administered were not "designed to address the question of whether a person can cooperate with their attorney," and psychological testing was, in any event, only "a kind of shortcut to spending just a whole bunch of time looking at that person through informed neuropsychological eyes." In Wornian's view, the day-to-day observations of staff like that in Napa were entitled to "equal, if not more" weight than test results "in determining what is going on with a person."

Wornian questioned Hyman's scoring of defendant's responses to the MacArthur competency test. For example, the test asked whether defendant thought he was more or less likely to be treated fairly by the legal system than others in trouble with the law, and why. Defendant circled the answer "less likely," and explained: "Probably because I have sex charges and assault charges, and they're hating on me because it involves children, and I didn't do it, and I think there's prejudice toward me. That's why I wanted my trial, to show them that I'm not guilty. I just lost my temper, and I never heard of sexual abuse of a child, but I've hollered and grabbed out of anger when they've got smart and got into my face." Whereas Wornian thought this was "a pretty good response," Hyman gave it only one point on a scale of zero (low) to two (high).

Psychologist Paul Good testified for the prosecution that the protocol for the MacArthur test encourages probing if an answer is incomplete or vague, and he opined that Hyman did not ask enough followup questions when he administered the test to defendant. For example, defendant was asked, "What are some of the jobs of the jury?" He answered, "To listen to both sides and to make a determination of who's got the most evidence." Hyman gave this response one point. Good thought that the response as it stood could have been given two points, but that if Hyman wanted "to be absolutely

6

careful," he could have asked defendant if he could be more specific about what he meant by a "determination," to confirm his understanding that the jury would render a verdict on guilt or innocence. Good thought that followup questions to defendant could have produced higher scores on 13 of the 22 items in the test, and resulted in findings of only mild, rather than clinically significant, impairment.

Defense psychologists Carol Walser and John Shields rescored defendant's MacArthur test using his responses to Hyman, and reaffirmed Hyman's finding of clinically significant impairment. Walser did not see the need for further probing of defendant's answers, and while Shields thought that a few followup questions would have been helpful, he questioned whether further probing would have changed the result.

C. Decision

The court actively questioned the witnesses at trial, and explained at length its reasons for deciding that defendant was competent:

"I have determined that Mr. Lowe suffers from some certain mental limitations that incline him towards tunnel vision that pose some memory problems for him. I've also determined that he does appear to suffer from certain mental disorders that incline him towards depression and towards what I'll generally refer to as paranoia [and] suspicion about others.

"But it has not been established to me by a preponderance of the evidence that these infirmities, such as they are, keep him from being able to understand the nature of the proceedings, or being able to assist counsel in a rational manner.

"[I] very carefully listened to the evidence and tried to carefully scrutinize it.

"I've also observed Mr. Lowe's demeanor during these proceedings, which has to be characterized as one of just complete withdrawal. It's as if he weren't interested at all in what was going on.

"But, at best, the totality of the evidence that's been presented here and my observations of the defendant during trial simply demonstrate to me that Mr. Lowe is a client who is difficult to deal with, and not that he can't rationally assist counsel in providing a defense.

7

"As I intimated earlier in the course of closing argument, I don't have much confidence in the results of the various tests administered by defense experts. The People in their cross-examination of those experts, I think, clearly showed that those results were the results of the exercise of judgment. And in my view, the exercise of the judgment, that was very much skewed and biased. Far from showing that . . . defendant's mental deficiencies . . . indicate that he can't rationally assist in providing a defense. [T]he questions that were asked of this defendant and the answers that he gave to those questions were just the opposite. [I]n my view they showed an above average understanding of the nature of criminal proceedings, and an above average understanding of the nature of the charges against him and his understanding of potential defenses to those charges.

"[I]'m not persuaded that he can't work with his counsel, and I'm not persuaded that [counsel can't] work with him.

"[B]ecause of a proclivity towards tunnel vision and because of suspicion of others and distrust of others and because of maybe some anger and also depression he's going to be a difficult person to work with, but nothing allows me to conclude that he is unable to provide counsel with the kind of assistance they need to defend him. Quite the opposite. [H]e understands what he's being charged with. He has a line of defense to it, that the actions towards the children are misinterpreted, that all he was doing was disciplining them, that he wasn't molesting them in any fashion or form, and that he wants to get on with it, and he [is] persuaded that once the witnesses take the stand and he confronts them that they're going to recant some of the things they have said, or he'll be able to explain the touchings as not being sexual or being for some other purpose.

"Mr. Markowitz—Nobody has told me, no evidence has really been presented that he can't provide details with regard to what happened on the days in question. Mr. Markowitz admitted that he never really went into them in any great length because his focus was on competency, as opposed to the merits or demerits of the underlying case. So although he had some question about whether—whether Mr. Lowe could go into the

8

details because of this tunnel vision that he described, he admitted, as he put it, in all fairness that he never did probe that very far.

[¶] . . . [¶]

"[M]r. Lowe has some mental deficiencies and mental disorders that create problems for [defense counsel] I'm sure, but I'm not persuaded by a preponderance of the evidence that these would keep him or make him incompetent within the [intendment] of Penal Code section 1365. So I do find him competent. That will be the order of the court."

D. Substantial Evidence

"A defendant who is mentally incompetent cannot be tried . . . . The defendant has the burden of proving incompetency by a preponderance of the evidence." (*People v. Marshall* (1997) 15 Cal.4th 1, 31 (*Marshall*); §§ 1367, subd. (a), 1369, subd. (f); see also *People v. Rells* (2000) 22 Cal.4th 860, 867 [defendant's burden applies at hearing on recovery of mental competence].) When a competency finding is challenged on appeal, we "must view the record in the light most favorable to the [finding] and uphold the [finding] if it is supported by substantial evidence," i.e., evidence that is "reasonable, credible, and of solid value." (*Marshall, supra*, 15 Cal.4th at p. 31.)

Defendant's brief "acknowledges the force of the substantial evidence rule on appeal and the burden he assumes when challenging the sufficiency of evidence particularly where the challenge focuses on the credibility of testimony, as it does here." This is not one of the rare cases where that burden can be overcome.

Jones's expert opinion alone constituted substantial evidence from which the court could find that defendant was competent. That opinion, based on extended observations of defendant, was reasonable, credible and of solid value. Defendant submits that his experts' opinions were entitled to greater weight than that of Jones because they had tested him more recently than Jones had observed him, but the relative weight of the competing opinions was a judgment call for the trial court. The court could reasonably agree with Wornian that trained observations such as those of Jones are more probative of a person's competence than tests such as those administered by Hyman and Young. The

9

court could also reasonably credit Wornian's and Good's criticisms of Hyman's test scoring.

The court cogently explained why it rejected the defense evidence, including Markowitz's testimony, and that evidence certainly did not as a matter of law compel a finding of incompetence. The court rendered a well-reasoned decision based on a careful review of the evidence, and the evidence provided ample support for its determination.

## II. TRIAL OF CHARGES

A. Facts

Doe I, born in December 1981, was in the fifth grade when a school counselor introduced him to defendant, who was working as a teacher's aide. Doe I considered defendant "my teacher, mentor, father," and started hanging out with him. Doe I's real father "wasn't . . . really around." Defendant was "a cool guy," who helped in Doe I's special education class, took him to the arcade, and played football with him. They talked about football a lot, and defendant told him he had played football in the Canadian league.[3]

Doe I slept over at defendant's place 15 to 20 times. One night in April 1995, while they were watching TV in defendant's bedroom, defendant put his hand on Doe I's penis, underneath Doe I's clothing, for about half a minute. Doe I went to the bathroom, and when he returned defendant put his hand on his penis again. Defendant grabbed Doe I's penis again one night in June 1995. After this third incident, Doe I told his mother what defendant had done, she took him to the police station, and he gave a statement recounting what had transpired.

The prosecutor asked Doe I why he went back to defendant after defendant touched his penis the first time. Doe I had difficulty answering, but finally responded, "I was in fear."

Doe II, born in September 1985, was 11 years old and in the fifth grade when he met defendant playing basketball at the Richmond YMCA. Doe II was in foster care

---

[3] It was stipulated that defendant never played professional football.

10

during the time of his relationship with defendant; over the years, he had more than 20 different foster parents. Defendant was a cool guy who said he had played professional football. Doe II started hanging out with defendant, who took him out to eat, to the movies, the horse track, and arcades.

Doe II described defendant's apartment as "Fairyland"—a place that had a lot of candy on the table, teddy bears, "everything I wanted as a kid." San Pablo Police Officer David Krastof, who executed a search warrant at the apartment in May 2000, testified that candy and stuffed animals were the first thing you saw when you went inside. Krastof said that there were boxes of popcorn and ice cream cones on top of the microwave, and pictures of defendant on the walls along with photos of sports heroes, political figures, and religious leaders. The only bed and TV in the apartment were in the one bedroom. The bedroom had a stereo system, video games and movies.

Doe II testified that, the third time he slept over at defendant's apartment, defendant rubbed his penis for three or four minutes over his underwear, and then got on top of him and humped him for five or 10 minutes, rubbing their penises together. Doe II tried unsuccessfully to roll over or push defendant away. The outside of Doe II's underpants around his penis was wet after defendant stopped. Doe II said that the same things happened the other 40 or 50 times he slept at defendant's place over the course of a year.

When the prosecutor asked Doe II why he returned to defendant's place after the first incident, Doe II answered, "Because it was fun to do the activities that he had. . . . [¶] Playing football and—playing the sports. We went to the YMCA and being active." Doe II said defendant told him to keep his mouth shut, and he never told anyone what was happening.

Doe II moved to Vallejo and stopped seeing defendant. When he moved back to Contra Costa County, he wanted to see defendant again because he thought defendant could help him play high school football, but his foster father would not let him look defendant up.

Doe III, born in May 1988, started hanging out with defendant when he was nine or 10 years old. Defendant was his football coach and became like a father to him. He looked to defendant as a father figure because "[I] didn't have a father figure then . . . ." Defendant took him to the mountains, amusement parks, arcades, and movies. He was impressed when defendant told him that he had played professional football for the Bengals. Eventually they started calling each other father and son, and holding themselves out to others as father and son.

Doe III slept over at defendant's apartment at least twice a week when he was 10 or 11 years old. Nearly every time, defendant would get on top of Doe III and hump him, rubbing their genitals together and leaving wet spots on the front of Doe III's briefs. Defendant sometimes stroked Doe III's penis, or put Doe III's hand on defendant's penis.

When the prosecutor asked Doe III why he kept going back to defendant's place despite the abuse, Doe III answered, "Because I looked at him like a dad. It's like—it was like anything I didn't have, you know, he would get for me. He was like a trade for a trade, you could say. He did whatever he did, and in return I got whatever I wanted or something." Defendant warned him that he "better not tell" his aunt or grandmother, and he did not tell anyone what was going on. When the prosecutor asked why he did not tell anyone, he said, "Embarrassment. [¶] . . . [¶] My friends thinking, you know, hey, I might have been gay, family looking at me different, church and things."

In cross-examination of Doe III, the defense brought out that he lived with his grandparents when he was involved with defendant, and that the grandparents were loving and supportive caregivers. The grandmother testified as a defense witness. In cross-examination she acknowledged that Doe III's father had not been around, and that defendant had been a mentor to Doe III. Doe III testified that he had mixed emotions when defendant was arrested. He admitted in cross-examination that he could have chosen to spend nights with his grandparents or aunt, rather than with defendant.

Doe IV, born in October 1989, was nine or 10 years old when he met defendant. He testified that Doe III, whom he knew as defendant's son, was his best friend. Defendant was "[l]ike a mentor" to Doe IV, a "nice person" who took him to arcades and

12

out to eat. Defendant's apartment had stuffed animals, pictures of defendant on the wall, and "[c]andy everywhere."

Doe IV slept over at the apartment once a week for three months during the summer of 1999. On every such occasion, defendant touched Doe IV's penis with his hand, got on top of Doe IV, and humped their penises together. One time defendant put his penis in Doe IV's butt. When defendant would pull Doe IV toward him, Doe IV would try to slide away from him, but defendant forced their contact.

Doe IV said that he did not tell anyone what defendant was doing to him because he was "scared," and felt that "it needed to be confidential." He said that, had he told his mother, she would have told his uncle, and the uncle would have come after defendant. Doe IV said he kept going back to defendant's house because he did not want to make defendant "paranoid and nervous" by letting him know that he objected to his conduct, and because they had fun until "it came down to going to sleep."

In cross-examination, Doe IV conceded that no one forced him to go to defendant's place. He said there were "incidents" in his home when his mom "got in a fight or something," and defendant would come to check on him and his mom "would be like go with him or whatever, you know, get out of here . . . ." Doe IV told a school counselor about the molestations before he told his mother. He was removed from his home and placed in foster care after the sexual abuse was revealed.

Four other witnesses, John Doe VIII, John Doe IX, John Doe X, and Creig C., also testified about their involvement with defendant when they were children. Defendant befriended them playing sports—Doe VIII at age 11 or 12, Doe IX at age nine, Doe X at age 11,[4] Creig C. at age 12 or 13—and they ended up sleeping at his home. The second time Creig C. slept over, he woke up and found defendant rubbing his penis with his hand. One of the times Doe IX slept over, defendant put his arm around him and rubbed his chest, an experience that made him uncomfortable. Doe X also woke up one night and felt uncomfortable when he found defendant's arm around him. Doe VIII, who

---

[4] From this point we also refer to these victims as Doe instead of John Doe.

testified for both the prosecution and defense, said that he slept over at defendant's home four times when he was 12, and that defendant never threatened or harmed him. When he slept over, defendant told him, but did not force him, to wear the underwear defendant bought for him. Defendant once hit him in the stomach, but not "in a physical way."

## B. CSAAS Evidence

### (1) Record

Dr. Anthony Urquiza testified over a defense *Kelly-Frye* objection (*People v. Kelly* (1976) 17 Cal.3d 24; *Frye v. United States* (D.C. 1923) 293 F. 1013) concerning child sexual abuse accommodation syndrome (CSAAS). Urquiza said that CSAAS is used to "dispel misperceptions or myths that people may have about what commonly occurs with a child who has been sexually abused." The syndrome has five facets: (1) secrecy; (2) helplessness; (3) entrapment and accommodation; (4) delayed and unconvincing disclosure; and (5) retraction.

The secrecy component addresses the fallacy that child victims of sexual abuse will disclose what is happening to stop it from occurring. Ninety percent of victims are abused by someone with whom they have an ongoing relationship, and the dynamics of the relationship—threats, favors, special attention—may lead children to conceal their sexual abuse. Children may keep the abuse secret even if they have a good relationship with an attentive caregiver.

The helplessness component addresses the misperception that children can fend off or run away from their molesters. Children are unable to ensure their own sexual safety because their abusers are more sophisticated and physically stronger. Children are particularly vulnerable when those responsible for protecting them do not provide proper supervision, and they are especially helpless when the caregiver is the abuser.

Entrapment and accommodation refer to children's ability to cope with abuse by compartmentalizing their feelings so as to appear surprisingly normal. Urquiza said that external signs of abuse are typically very limited, and that, after 20 years of practice in the field, he is unable to tell from observing a child whether he or she has been abused.

Delayed and unconvincing disclosure describe how reports of abuse are generally made. Contrary to expectations, immediate reports of abuse are rare. Seventy four percent of child abuse victims do not reveal their abuse in the first 12 months in which it occurs, and 35 percent or more of victims do not reveal the abuse until they are adults. The disclosure, when it occurs, may be unconvincing because victims generally do not disclose everything all at once, and may give different versions of events over time. Disclosure is best conceived as a process, rather than a single event, where progressively more is revealed as the victim overcomes feelings of embarrassment, humiliation and fear of retribution.

The final feature of the syndrome, retraction, occurs in 15 to 20 percent of cases, because of pressure from the perpetrator or the perpetrator's supporters, or because of fear of having to testify about what transpired.

Urquiza acknowledged that he had not met any of the victims in defendant's case, and that he was not testifying as to whether they had been molested. He said that CSAAS was "a means to describe what commonly occurs with children who have been sexually abused," rather than "a diagnostic tool." He said that there had been abundant research supporting each facet of the syndrome since it was identified in 1983, but that the syndrome was not reflected in every case.

Before Urquiza testified, and again at the end of the case, the jury was instructed pursuant to CALJIC No. 10.64 as follows:

"Evidence has been presented to you concerning child sexual abuse accommodation syndrome. This evidence is not received and must not be considered by you as proof that an alleged victim's molestation claim is true.

"Child sexual abuse accommodation syndrome research is based upon an approach that is completely different from that which you must take to this case. The syndrome research begins with the assumption that a molestation has occurred, and seeks to describe and explain common reactions of children to that experience. As distinguished from that research approach, you are to presume the defendant innocent. The People have the burden of proving guilt beyond a reasonable doubt.

15

"You should consider the evidence concerning the syndrome and its effect only for the limited purpose of showing, if it does, that an alleged victim's reactions, as demonstrated by the evidence, are not inconsistent with him having been molested."

(2) Discussion

Defendant acknowledges that case law supports admission of CSAAS evidence for the limited purpose identified in the foregoing instruction. (See *People v. McAlpin* (1991) 53 Cal.3d 1289, 1300-1301 *(McAlpin)*; *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744-1745 *(Patino)*.) In *McAlpin,* our Supreme Court indicated that expert testimony on CSAAS " '[i]s needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior," and noted that the "great majority of courts approve" of the use of such testimony. (See also Askowitz et al., *The Reliability of Expert Psychological Testimony in Child Sexual Abuse Prosecutions* (1994) 15 Cardozo L.Rev. 2027, 2039, 2040 *(Reliability)* ["[t]here appears to be acceptance within the scientific community that CSAAS identifies and describes behavioral characteristics commonly found in victims of child sexual abuse. . . . [¶] . . . [¶] The overwhelming majority of jurisdictions will allow testimony based on CSAAS when it is used to explain the significance of the child complainant's seemingly self-impeaching behavior, such as delayed reporting or recantation"].)

"Identifying a 'myth' or 'misconception' has not been interpreted as requiring the prosecution to expressly state on the record the evidence which is inconsistent with the finding of molestation. It is sufficient if the victim's credibility is placed in issue due to the paradoxical behavior, including a delay in reporting a molestation." *(Patino, supra,* 26 Cal.App.4th at pp. 1744-1745.) CSAAS testimony was admissible in *People v. Wells* (2004) 118 Cal.App.4th 179, 190, for example, because the victim "had not immediately reported the alleged abuse, and when she eventually did tell adults her disclosures were piecemeal and sometimes contradictory in the details." Such testimony was likewise admissible here given the victims' delayed disclosures, and their "paradoxical behavior"

of submitting to repeated molestations, and defendant does not argue that there was an insufficient foundation for introduction of the evidence.

Defendant contends more broadly that "it is time to reconsider the propriety of admitting [CSAAS] testimony at all." Defendant ventures "that the passage of nearly twenty years since the CSAAS theory was first articulated and the proliferation in the media of various detailed accounts of numerous child sexual abuse cases has rendered the subjects the theory addresses within the common knowledge of the typical juror," and thus that the syndrome is no longer a proper subject of expert testimony. (Evid. Code, § 801, subd. (a) [expert may opine on "a subject that is sufficiently beyond common experience that the opinion of the expert would assist the trier of fact"].)

However, defendant cites no authority for this proposition other than assertions in *Commonwealth v. Dunkle* (Pa. 1992) 602 A.2d 830, 836-838 (*Dunkle*)—the leading case for the minority view that CSAAS is inadmissible (see *Reliability, supra,* 15 Cardozo L.Rev. at p. 2044)—that failures of sexually abused children to promptly report abuse or recall dates and details of the abuse are matters of common understanding. *Dunkle*'s reasoning was implicitly rejected in *McAlpin*, which adhered to the majority rule that CSAAS is admissible, and no subsequent case suggests that our Supreme Court would now hold a different view. To the contrary, the court reaffirmed *McAlpin*'s endorsement of CSAAS testimony in *People v. Brown* (2004) 33 Cal.4th 892, 906. Defendant's claim that the public has become so well informed about the behavior of child abuse victims as to obviate CSAAS evidence is speculative, and contrary to controlling authority in this state.

Defendant's other argument against admission of the CSAAS evidence is that the syndrome is "junk science." Again, however, his supporting authorities are inapposite. He cites articles showing that CSAAS "has been rejected by the relevant scientific community as a diagnostic tool for making child sexual abuse determinations," but Dr. Urquiza explained that the syndrome was not a diagnostic tool, and that he was not purporting to opine on whether any of the victims had in fact been molested. CSAAS

17

evidence was properly admitted here for the limited purpose described in CALJIC No. 10.64.

C. Sentencing

Defendant asserts *Cunningham* error as to the upper term concurrent sentences imposed for count 5 (continuous sexual abuse of Doe II) and count 41 (sodomy of Doe IV).

The court imposed the upper terms based on findings that the single factor in mitigation, defendant's lack of a criminal record (Cal. Rules of Court, rule 4.423(b)(1)),[5] was outweighed by the following factors in aggravation relating to the crimes: high degree of cruelty, viciousness, and callousness (rule 4.421(a)(1)); particularly vulnerable victims (rule 4.421(a)(3)); planning, sophistication, and professionalism (rule 4.421(a)(8)); and exploitation of a position of trust and confidence (rule 4.421(a)(11)).

Here, as in *People v. Sandoval* (2007) 41 Cal.4th 825 (*Sandoval*), "[n]one of the aggravating circumstances cited by the trial court come within the exception set forth in *Blakely*. Defendant had no prior criminal convictions. All of the aggravating circumstances cited by the trial court were based upon the facts underlying the crime[s]; none were admitted by defendant or established by the jury's verdict. [A]ccordingly, . . . defendant's Sixth Amendment rights were violated by the imposition of [the] upper term sentence[s]." (*Id.* at pp. 837-838, italics omitted.) The errors were harmless, however, if it appears that, had existence of the aggravating circumstances been submitted to the jury, "the jury, applying the beyond-a-reasonable-doubt standard, unquestionably would have found true at least a single aggravating circumstance . . . ." (*Id.* at p. 839.)

We have no doubt that a jury would have found true multiple aggravating factors supporting the upper term sentences for the crimes against Doe II and Doe IV here.

The evidence established that defendant sought out situations where he could meet and befriend the young boys on whom he preyed. Defendant set up his apartment to be what Doe II called a "Fairyland" for his victims, with, as Doe IV recalled, stuffed animals

---

[5] All further rule references are to the California Rules of Court.

18

and "candy everywhere." The apartment was arranged so as to lure children who slept over into defendant's bed, the only bed in the apartment, next to the only TV. We can confidently conclude that a jury would have found, beyond a reasonable doubt, that the crimes were carried out with considerable planning.

Doe II, an 11-year-old boy with multiple foster placements, was "obviously and indisputably" (*Sandoval*, *supra*, 41 Cal.4th at p. 842) a particularly vulnerable victim. Defendant—Doe IV's "mentor" and "father" of his best friend—clearly and uncontestably took advantage of a position of trust in Doe IV's life.

There was no prejudicial error in connection with the concurrent sentences.

### III. DISPOSITION

The judgment is affirmed.

_____ _____
Marchiano, P.J.

We concur:


_____ _____
Swager, J.


_____ _____
Margulies, J.


*People v. Lowe, A112739*

20